UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION
CIVIL ACTION NO.:  0:15-cv-03756-MGL

---

| | |
|---|---|
| JAMES NALLY, derivatively on behalf of 3D SYSTEMS CORPORATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ABRAHAM N. REICHENTAL, DAMON J. GREGOIRE, CHARLES W. HULL, DANIEL S. VAN RIPER, G. WALTER LOEWENBAUM, II, JIM D. KEVER, KAREN E. WELKE, KEVIN S. MOORE, PETER H. DIAMANDIS, WILLIAM D. HUMES, and WILLIAM E. CURRAN, )<br>)<br>Defendants, )<br>)<br>and )<br>)<br>3D SYSTEMS CORPORATION, )<br>)<br>Nominal Defendant. ) | COMPLAINT<br>(Jury Trial Demanded) |

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff James Nally ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant 3D Systems Corporation ("3D" or the "Company") and against certain officers and/or directors of the Company for breaches of fiduciary duties.  Plaintiff alleges upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation, review of public filings with the United States Securities and Exchange Commission ("SEC"), press releases and other publications disseminated by the Company, news articles,

shareholder communications, and postings on 3D's website concerning the Company's public statements.

## SUMMARY

1.     Nominal Defendant 3D is a holding company that during the past three years has acquired approximately forty different businesses engaged in different aspects of the three-dimensional (3-D) printing business, during which time, the Company's stock price tripled.

2.     Though 3D acquired its various companies at an average purchase price equal to twice the annual revenue of the acquired company, 3D's market capitalization during the relevant period was approximately twenty times revenues, over two or three times the capitalization to revenues ratios of other competing companies.

3.     As described herein, 3D's disproportionately high market capitalization and correspondingly high stock price (in relation to total revenues) was not the result of any technologically superior 3D printer product, or 3D printer that was a leader in its category, but resulted in large part from self-created media hype primarily disseminated by President and CEO Avi Reichental.

4.     The Company operates globally, with segments of its operations in parts of the Americas, Germany and Asia Pacific.  3D was founded by Defendant Charles W. Hull in 1986. The Company is headquartered in Rock Hill, South Carolina.

5.     As the Company acquired other companies, the Individual Defendants misleadingly attributed rapidly increasing sales to demand for the Company's products, which was presented as an indication that sales would continue to grow, when in fact the increased sales were merely a reflection of the addition of sales of companies acquired by the Company.

6.      Beginning in October 2013 and continuing through the present (the "Relevant Period"), Defendants caused 3D to release information in its public filings promoting the Company's business and prospects to investors in an effort to artificially inflate the true value of the Company's stock.  Once the Company's stock reached inflated prices and without disclosing the true nature of the Company's business, several of the Individual Defendants traded their Company stock on the material, adverse and non-public information, reaping millions of dollars in the trades.  Defendants caused this promotional scheme by deceptively making the market believe the Company's prospects were better than they actually were, and the Company has been and will continue to be irreparably harmed as a result.

7.      The Individual Defendants caused the Company to release false and misleading information concerning (i) the Company's ability to increase the capacity of its metal printing business; (ii) demand for its consumer products; (iii) the value of multiple companies it was acquiring; and (iv) its expected earnings.

8.      When the true nature of the Company's prospects were revealed, 3D's stock price began to plummet and currently trades around $12-14, as opposed to a high of $96.42 during the Relevant Period while the Defendants promoted the Company's future prospects and opportunities.

9.      In particular, Defendant Reichental, the Company's Chief Executive Officer and President, as well as a Board member, highly touted the Company's acquisitions and manufacturing capacity throughout the Relevant Period.  On October 29, 2013, when the Company released its third quarter results for 2013, Defendant Reichental stated that the Company "decided to triple our manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct metal 3D printer models."

10.    In fact, the Company was not poised to and could not increase its printing capacity by that amount.  Instead of accurately revealing the true prospects of the Company, certain of the Defendants went on to benefit from the positive news released to the public that was false and misleading.

11.    In response to the news being released by the Defendants concerning the Company's business, 3D offered 5,950,000 shares of its stock for sale to the public on May 29, 2014, netting nearly $300 million.  Furthermore, Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper, Gregoire and Kever were able to take significant advantage of the optimism surrounding the Company and traded in portions of their 3D stock, reaping benefits of over $85 million in proceeds.

12.    The Defendants caused the Company to release further glowing reports concerning the Company's business and prospects moving forward.  For instance, on February 28, 2014, in the Company's fourth quarter for 2013 earnings conference call with investors and analysts, Defendant Reichental described several recent acquisitions with the expectation that they would lead 3D to be leaders in several market categories.  Defendant Reichental even stated "we believe that direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years and our plan is to as much as quadruple sales over the next 12 months to 18 months."

13.    On this news, the Company's stock jumped 6.8%, to close at $79.77 on February 28, 2014, the same day that Defendant Reichental pumped the Company's prospects in the investor and analyst conference call for the fourth quarter 2013.  In less than one week after these statements were made, Defendants Loewenbaum and Reichental sold shares, collectively reaping proceeds of over $9 million combined.

14.    On April 29, 2014, Defendant Reichental continued to promote the Company's prospects in the Company's first quarter 2014 earnings conference call with analysts and investors by representing that the Company was expanding its direct metal sales capacity.  Furthermore, Defendant Reichental touted the Company's "plan to quadruple direct metal printer sales over the next 12 months to 18 months."

15.    In reality, the Company was unable to expand its sales by that substantial amount and the Defendants took advantage of the market's eagerness in the wake of this news by selling more of their 3D stock at artificially inflated prices.  For instance, between May 7, 2014 and May 19, 2014, Defendants Gregoire and Hull reaped benefits of nearly $2 million in proceeds from the sale of their stock.

16.    However, Defendants could not conceal the true problems with the Company for long.  On July 31, 2014, the Company issued a press release announcing its financial results for the second quarter and six months of 2014.  In that press release, it was further revealed that the Company's revenue was off the mark from analysts' expectations and 3D's stock fell nearly 11% as a result.

17.    The problems continued when more information concerning the Company's true prospects were recognized on October 22, 2014 when 3D issued a preliminary report announcing its expected third quarter results for 2014, showing even lower full year revenue and earnings.  In that press release, the Company stated the problems were related to capacity constraints for its direct metal printers.

18.    On this news, 3D's stock continued to fall, dropping over 15%.

19.     As a result of the Defendants wrongful conduct in concealing material, adverse information from the investing public, the Defendants have breached their fiduciary duties to the Company.

20.     Furthermore, Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper, Gregoire and Kever significantly profited from the hidden information by trading on the Company's stock while at the artificially inflated prices created by the Defendants during the Relevant Period.

21.     As such, the Individual Defendants are liable to the Company for the harm suffered by it and its shareholders.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and the Defendants are citizens of different states and the matter in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

23.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) and Rule 3.01 of the Local Civil Rules (D.S.C.), because a substantial portion of the wrongs, transactions and acts complained of occurred herein, including Defendants' involvement in those wrongs, as detailed herein.  The Company is headquartered in this District, with Defendants receiving substantial compensation in this District by engaging in business here, which has and will continue to have a substantial effect in this District.

## THE PARTIES

24.     Plaintiff James Nally has continuously been a shareholder throughout the period of the wrongdoings complained of herein, and is a current 3D shareholder.  Plaintiff Nally is a citizen of Ohio.

25.     Nominal Defendant 3D is a Delaware Corporation with its headquarters and principal place of business located at 333 Three D Systems Circle, Rock Hill, South Carolina 29730.  The Company provides 3-D digital design and fabrication solutions, including 3-D printers, print materials and cloud-sourced custom parts.  The Company operates globally, with business segments in the Americas, Germany and Asia Pacific.

26.     Defendant Abraham N. Reichental ("Reichental") has been a director, President and Chief Executive Officer ("CEO") of 3D since September 2003.  Defendant Reichental is not an independent director, as disclosed by the Company in its 2015 Proxy Statement, filed with the SEC on March 24, 2015 (the "2015 Proxy").  Furthermore, Defendant Reichental is a member of the Sustainability and Executive Committees of the Company's Board of Directors (the "Board").  Upon information and belief, Defendant Reichental is a citizen of South Carolina.

27.     Defendant Charles W. Hull ("Hull") is the founder of the Company, has been a director since 1993 and has been the Chief Technology Officer since 1997, as well as Executive Vice President since 2000.  The Company lists Defendant Hull as not an independent director in its 2015 Proxy.  Upon information and belief, Defendant Hull is a citizen of South Carolina.

28.     Defendant Daniel S. Van Riper ("Van Riper") has been a director of the Company since 2004 and currently is a member of the Audit and Compensation Committees.  Upon information and belief, Defendant Van Riper is a citizen of Florida.

29.     Defendant G. Walter Loewenbaum, II ("Loewenbaum") has been a director and the Chairman of the Board since 1999.  Defendant Loewenbaum is also currently a member of the Compensation Committee and the Chairperson of the Executive Committee.  Upon information and belief, Defendant Loewenbaum is a citizen of Texas.

30.     Defendant Jim D. Kever ("Kever") has been a director of the Company since 1996 and currently is the Chairperson of the Sustainability Committee and a member of the Corporate Governance and Nominating Committee.  Upon information and belief, Defendant Kever is a citizen of Tennessee.

31.     Defendant Karen E. Welke ("Welke") has been a director of the Company since 2008 and is currently the Chairperson of the Compensation Committee and a member of the Corporate Governance and Nominating Committee.  Upon information and belief, Defendant Welke is a citizen of Minnesota.

32.     Defendant Kevin S. Moore ("Moore") has been a director of the Company since 1999 and currently is the Chairperson of the Corporate Governance and Nominating Committee as well as a member of the Audit and Executive Committees.  Upon information and belief, Defendant Moore is a citizen New York.

33.     Defendant Peter H. Diamandis ("Diamandis") has been a director of the Company since 2013 and is currently a member of the Sustainability Committee.  Upon information and belief, Defendant Diamandis is a citizen of California.

34.     Defendant William D. Humes ("Humes") has been a director of the Company since 2014 and is currently a member of the Sustainability Committee.  Upon information and belief, Defendant Humes is a citizen of California.

35.     Defendant William E. Curran ("Curran") has been a director of the Company since 2008 and is currently the Chairperson of the Audit Committee and a member of the Executive Committee.  Upon information and belief, Defendant Curran is a citizen of New York.

36.     Defendant Damon J. Gregoire ("Gregoire") has been an Executive Vice President of Mergers & Acquisitions since November 11, 2014.  Defendant Gregoire was the Chief Financial Officer ("CFO") at the Company from April 25, 2007 to November 11, 2014, and has also previously been the Company's Senior Vice President & Principal Accounting Officer.  Upon information and belief, Defendant Gregoire is a citizen of South Carolina.

37.     The defendants identified in ¶¶ 26 to 36 above shall be referred to as the "Individual Defendants" and/or the "Defendants" herein.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

38.     The Company is a Delaware corporation that was founded in 1986 by Defendant Hull and is headquartered in Rock Hill, South Carolina.  3D Systems Corporation, through its subsidiaries, operates as a provider of 3-D printing centric design-to-manufacturing solutions in the Americas, Germany, and the Asia-Pacific, as well as other European, Middle East, and African countries.  The Company's 3-D printers transform data input from the format generated by 3D design software, CAD software, or 3D scanning and sculpting devices to printed parts using integrated, engineered plastic, metal, nylon, rubber, wax, and composite print materials for use in Accura, DuraForm, CastForm, LaserForm, and VisiJet brand names.  The Company sells its products and services through its direct sales force, sales agents, resellers, and distributors.

## The False and Misleading Representations

39. Defendants caused 3D to release information in its public filings promoting the Company's business and prospects to investors in an effort to artificially inflate the true value of the Company's stock. Once the Company's stock reached inflated prices and without disclosing the true nature of the Company's business, several of the Individual Defendants traded their Company stock on the material, adverse and non-public information, reaping millions of dollars in the trades. Defendants caused this promotional scheme to continue for over two years and the Company has been and will continue to be irreparably harmed as a result.

40. On October 29, 2013, the Individual Defendants caused the Company to issue a press release entitled "3D Systems Reports Q3 Results," in which the Individual Defendants further promoted the Company's prospects. The press release stated, in relevant part:

ROCK HILL, South Carolina – October 29, 2013 - 3D Systems Corporation (NYSE: DDD) announced today that its third quarter revenue grew 50% from the prior year to a record $135.7 million on a 76% increase in printers' and other products revenue and 30% overall organic growth, resulting in GAAP earnings of $0.17 per share and non-GAAP earnings of $0.26 per share.

Gross profit increased 52% and gross profit margin expanded 80 basis points to 52.6%, contributing to GAAP net income of $17.7 million, and non-GAAP net income of $26.2 million, representing a 44% improvement over the 2012 quarter.

For the nine months 2013, revenue grew 42% to $358.6 million, on an 81% increase in printers and other products revenue and 27% organic growth, resulting in GAAP earnings of $0.34 per share and non-GAAP earnings of $0.66 per share. Gross profit increased 46% and gross profit margin expanded 120 basis points to 52.3%.

Third Quarter 2013 Revenue Highlights (compared to 2012 quarter):
• 3D printers and other products revenue increased 76% to $59.8 million.
• Print materials revenue grew 30% to $33.2 million.
• Services revenue rose 38% to $42.7 million.
• Healthcare revenue grew 39% and contributed $16.9 million to our total revenue.
• Consumer solutions contributed $13.5 million to our total revenue.

41.    Defendant Reichental, in the press release for 2013 announcing the Company's third quarter results, reported that the Company experienced a second straight quarter with record revenue from printer unit sales as well the decision to rapidly increase the development of several products, channels and technologies, further continuing the promotional scheme.

42.    As a result of the Company's steady release of the above described overly optimistic and misleading press releases associated with quarterly earnings reports, the Company's stock jumped 300% in nine months, soaring to $92.93 on December 1, 2013 from $32.24 per share on March 1, 2013, while today the Company's stock trades at approximately $13 per share.

43.    On February 28, 2014, the Individual Defendants caused the Company to issue a press release entitled "3D Systems Reports Q4 and Full Year 2013 Results," which stated, in relevant part:

> ROCK HILL, South Carolina – February 28, 2014 - 3D Systems Corporation (NYSE: DDD) announced today that its fourth quarter revenue grew 52% from the prior year to a record $154.8 million on 34% overall organic growth, resulting in GAAP earnings of $0.11 per share and non-GAAP earnings of $0.19 per share for the fourth quarter.
>
> For the fourth quarter 2013, gross profit increased 53% and gross profit margin remained flat at 51.7% compared to the 2012 fourth quarter, and contributed to GAAP net income of $11.2 million, and non-GAAP net income of $19.7 million.
>
> For the full year 2013, revenue increased 45% to a record $513.4 million on 80% printers and other products growth and 29% organic growth, resulting in GAAP earnings of $0.45 per share and non-GAAP earnings of $0.85 per share for the year. Gross profit increased 48% and gross profit margin expanded 90 basis points to 52.1%.
>
> Fourth Quarter 2013 Revenue Highlights (compared to 2012 quarter):
> - 3D printers and other products revenue increased 76% to $73.9 million.
> - Print materials revenue grew 39% to $37.2 million.
> - Services revenue rose 33% to $43.7 million.
> - Healthcare revenue increased 67% to $21.8 million.
> - Consumer solutions expanded 162% to $8.9 million.
>
> Full Year 2013 Revenue Highlights (compared to 2012):

- 3D printers and other products revenue increased 80% to $227.6 million.
- Print materials revenue grew 24% to $128.4 million.
- Services revenue rose 27% to $157.4 million.
- Healthcare revenue increased 45% to $71.7 million.
- Consumer solutions expanded 206% to $34.8 million.

44.    The Defendants caused the Company to release further glowing reports concerning the Company's business and prospects moving forward.  For instance, on February 28, 2014, in the Company's fourth quarter for 2013 earnings conference call with investors and analysts, Defendant Reichental, President and CEO of 3D, described several recent acquisitions with the expectation that they would lead 3D to be leaders in several market categories.  Defendant Reichental stated, "we believe that direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years and our plan is to as much as quadruple sales over the next 12 months to 18 months."  Defendant Reichental knew at the time he made the above statement that there was no reasonable basis upon which to make such a projection.

45.    Defendant Reichental stated in that conference call, in pertinent part:

We expect the recent acquisition of Village Plastics to bolster our consumer material development and margins and the alliance and partnerships with domain experts in toys and food to position us for leadership in those categories. Furthermore, we expect the acquisitions of Gentle Giant and Digital PlaySpace to enhance our brand publishing capabilities and the attractiveness of our consumer and retail platform.

*       *       *

Based on our current line-up of direct metal printers, customer demand and plant capacity expansions, we expect our direct metal business to generate between $25 million and $50 million of revenue in 2014. And for metals, this represents the beginning.

Some may view this as a small niche. However, we believe that direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years and our plan is to as much as

12

quadruple sales over the next 12 months to 18 months. We believe that plan is fully consistent with the growing demand of our expanding direct metal line-up.

46.    On this news, the Company's stock jumped 6.8%, to close at $79.77 on February 28, 2014, the same day that Defendant Reichental pumped the Company's prospects in the investor and analyst conference call for the fourth quarter 2013.  In less than one week after these statements were made, Defendants Loewenbaum and Reichental sold shares, collectively reaping proceeds of over $9 million combined.

47.    On April 29, 2014, Defendant Reichental continued to promote the Company's prospects in the Company's first quarter 2014 earnings conference call with analysts and investors by representing that the Company was expanding its direct metal sales capacity.  Furthermore, Defendant Reichental again touted the Company's "plan to quadruple direct metal printer sales over the next 12 months to 18 months."

48.    During the April 29, 2014 conference call, Defendant Reichental stated, in pertinent part:

> Growing direct metal 3D printer sales again outstripped our manufacturing capacity during the first quarter, even as we continued to add capacity, and contributed to our increased total printer's backlog.
>
> *       *       *
>
> In the first quarter, 3D printers and other products revenue grew 53% to $60.8 million and made up 41% of total revenue. 3D printers alone contributed $50.7 million, growing some 60% over the 2013 quarter. All our printer categories experienced strong demand, and our effective sales and marketing direct metal printers campaign continued to produce greater demand, once again outpacing our manufacturing capacity, even as we continue to add capacity.
>
> *       *       *
>
> We continue to expand manufacturing capacity across our portfolio, including accelerated expansion of our direct metals manufacturing, as demand from industrial companies continues to outpace our capacity. Healthcare remains one of our fastest growing verticals, as we continually focus on extending our applications

and reach. In line with that, in April, we acquired Medical Modeling, a leading provider of 3D printing-enabled patient-specific medical devices and personalized surgical treatments, including proprietary virtual surgical planning and clinical transfer tools.

*        *        *

We entered the second quarter of 2014 with positive sales momentum and increased backlog, driven by continued strong demand for advanced manufacturing activities across all of our categories. As our new, faster, and more advanced 3D printers and materials gain traction, we expect accelerated revenue growth for the second half of this year. We continue to view direct metal printing as a very important and exciting manufacturing growth opportunity and plan to quadruple direct metal printer sales over the next 12 months to 18 months.

49.     In reality, the Company was unable to expand its sales by anything approaching the type of expansion which Defendants had been projecting for many months as detailed above. Defendants took advantage of the market's eagerness in the wake of the unrealistic projections they issued by selling more of their 3D stock at artificially inflated prices.  For instance, between May 7, 2014 and May 19, 2014, Defendants Gregoire and Hull reaped benefits of nearly $2 million in proceeds from the sale of their stock.

**The Truth Emerges**

50.     After several quarters of the Individual Defendants pumping 3D stock and its prospects, the truth finally began to emerge about the true condition of the Company when the Defendants caused 3D to issue a press release entitled "3D Systems Reports Second Quarter and Six Months 2014 Financial Results."  The press release stated, in relevant part:

ROCK HILL, South Carolina – July 31, 2014 - 3D Systems Corporation (NYSE: DDD) announced today that its second quarter revenue grew $30.7 million, or 25%, from the prior year to $151.5 million on strong demand for its design and manufacturing printers, materials and services, resulting in second quarter GAAP earnings of $0.02 per share and non-GAAP earnings of $0.16 per share.

Organic growth amounted to 10% as additional orders-in-hand, including $23.1 million of printer orders, a 29% sequential increase over the March backlog for

printers, expanded the company's second quarter total backlog to a record $31.9 million.

Gross profit margin shouldered the transitional effects of concentrated new product launches as well as the absorption of legacy products obsolescence and manufacturing expansion costs. Together, these factors and changed mix compressed gross profit margin some 400 basis points from the prior year's quarter to 47.8%.

For the six months 2014, revenue grew $76.4 million, or 34%, with growth distributed broadly across all categories, to $299.3 million, resulting in GAAP earnings per share of $0.07 per share and non-GAAP earnings per share of $0.30 per share.

51.    The $150 million in actual revenue was far short of predicted $162.3 million expected by Wall Street based upon the above detailed statements and projections made by Defendants.  Gross margins were also lower than the expected forecast of 51%, coming in at only 47.8%.  Likewise, the Company's organic growth sunk to 10% from a previous point of 30% in earlier quarters.

52.    On this information, the Company's stock suffered an 11% drop, or $5.94 per share, to close at $50.13 per share, and continued to decline thereafter.  This decrease erased nearly $653 million in market capitalization and allowed the Defendants to reap millions more by selling earlier in the Relevant Period, when the Company's stock price was bloated from the false statements in the Company's quarterly reports.

53.    Despite the emergence of true prospects of the Company, Defendant Reichental, in the July 31, 2014 press release, stated:

While transitional forces temporarily pressured our gross profit margin, a detailed examination of the specific drivers, confirms that the fundamentals of our business are intact and our gross profit margins are poised to rebound and resume their expansion trajectory…Consistent with our historical performance, we expect to generate a higher portion of our revenue during the second half on rebounding margins. Record bookings for our design and manufacturing printers together with rising orders for our consumer products provides us with confidence in our ability to achieve our 2014 guidance.

54.    As the news of 3D's true prospects began to emerge, *Business Insider* released an article entitled "3D Systems Shares are Cratering," in which truth about the Company and the previous glowing reviews by the Individual Defendants emerged to the investing public.  The *Business Insider* stated in relevant part:

> Shares in 3D Systems were down more than 12% in pre-market trading Thursday after the firm reported earnings and revenue that fell short of expectations.
>
> Q2 EPS came in at $0.16 a share versus forecasts for $0.18. Revenue hit $151.5 million against $162.3 million expected.
>
> Inventory climbed to $90 million versus $86 million forecast, and gross margin came in at 47.8% versus 51% forecast.
>
> CEO Avi Reichental said spending on new product launches held profits back this quarter but that underlying trends remained sound.

55.    Although, after the July 31, 2014 announcement, the Company continued to lose market capitalization and watched its stock price slowly decline, it was still trading at artificially inflated prices, and continued to do so until the Individual Defendants caused 3D to release preliminary results for the third quarter of 2014.

56.    On October 22, 2014, the Company issued a press release entitled "3D Systems Announces Preliminary Third Quarter 2014 Results," which announced that actual third quarter results for 2014 would be lower than original expectations.  In particular, the Company announced that "[s]trengthening sales of the company's design, manufacturing and healthcare products and services were not enough to overcome the revenue shortfall from the continued manufacturing capacity constraints for its direct metals printers and delayed availability of its newest consumer products."

57.    The problems continued when more information concerning the Company's true prospects was revealed on October 22, 2014 when 3D issued a preliminary report announcing its

expected third quarter results for 2014, showing even lower full year revenue and earnings. In that press release, the Company stated the problems were related to capacity constraints for its direct metal printers.

58.    In particular, the Company announced that its third quarter revenue was expected to be significantly below the expectations of nearly $186 million, based upon Defendants' above described statements and projections. Instead, the Company reported third quarter revenue to be only between $164 million to $169 million. Furthermore, the Company lowered its outlook for its full year revenue to come in between only $650 million to $690 million, as opposed to Wall Street expectations of over $700 million.

59.    On this news, 3D's stock continued to fall, dropping over 15% to close at $36.67 per share, a decrease of $6.71 per share. This significant drop caused the Company to lose $737.5 million in market capitalization.

60.    As a result of the Defendants wrongful conduct in concealing material, adverse information from the investing public, the Defendants have breached their fiduciary duties to the Company.

61.    As detailed herein, Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper, Gregoire and Kever significantly profited from the hidden information by trading on the Company's stock while at the artificially inflated prices created by the Defendants during the Relevant Period.

**Illegal Trades Made Throughout the Relevant Period**

62.    Throughout the relevant period, as the Defendants promoted the Company's stock through false and misleading statements, certain of the Individual Defendants capitalized on the artificial stock price by cashing in part or all of their shares in 3D. Defendants Reichental, Hull,

Loewenbaum, Moore, Van Riper, Gregoire and Kever all made one or more trades throughout the Relevant Period based on the artificially inflated price of 3D's stock, reaping benefits of over $85 million in proceeds.

63.    Defendant Reichental made four trades[1] and sold 544,000 shares throughout the Relevant Period for total proceeds of $24,814,447.

64.    Defendant Hull made seven trades[2] and sold 55,000 shares throughout the Relevant Period for total proceeds of $2,591,825.

65.    Defendant Loewenbaum made eight trades[3] and sold 951,479 shares throughout the Relevant Period for total proceeds of $43,244,499.

66.    Defendant Moore made one trade[4] and sold 15,000 shares throughout the Relevant Period for total proceeds of $1,026,600.

67.    Defendant Van Riper made six trades[5] and sold 27,613 shares throughout the Relevant Period for total proceeds of $1,441,853.

68.    Defendant Kever made one trade[6] and sold 38,000 shares throughout the Relevant Period for total proceeds of $1,520,000.

69.    Defendant Gregoire made five trades[7] and sold 207,500 shares throughout the Relevant Period for total proceeds of $10,728,850.

---

[1] The dates Defendant Reichental sold his shares were May 15, 2013, December 13, 2013, March 14, 2014, and August 29, 2014.

[2] The dates Defendant Hull sold his shares were May 19, 2014, June 6, 2014, July 21, 2014, August 18, 2014, September 15, 2014, October 20, 2014 and November 19, 2014.

[3] Defendant Loewenbaum made three trades on May 15, 2013, two trades November 11, 2013, two trades on March 5, 2014 and one trade on March 6, 2014.

[4] Defendant Moore's sale occurred on November 5, 2013.

[5] Defendant Van Riper made two trades on May 5, 2013 and four trades on May 17, 2013.

[6] Defendant Kever's sale occurred on May 15, 2013.

[7] Defendant Gregoire's trades occurred on May 15, 2013, November 15, 2013, May 7, 2014, August 27, 2014, and November 19, 2014.

## DEFENDANTS' DUTIES

70.     As officers and directors of the Company, the Defendants had the ability to control the business and corporate affairs of 3D and owe Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.  The Individual Defendants were and are required to use their utmost ability to control and manage 3D so as to operate in a legal and honest fashion.  The Individual Defendants were and are required to act in furtherance of the best interests of 3D and its shareholders so as to benefit all shareholders.

71.     Each director and officer of the Company owes to 3D and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

72.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of 3D, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by 3D.

74.     Because of their advisory, executive, managerial and directorial positions with 3D, each of the Defendants had a duty to know of and understand the basic business of the Company such that they knew of the true business and prospects of the Company and related that information correctly and accurately to the Company's investors and potential investing public.

19

75.     Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of 3D were required to, among other things:

a.  Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b.  Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  Properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

d.  Remain informed as to how 3D conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

e.  Ensure that 3D was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

76.     In addition to these duties, the Company has adopted an Insider Trading Compliance Policy (the "Insider Policy") with the purpose "to provide guidance to anyone who

works for 3D Systems Corporation…with respect to trading in the Company's securities as well as in securities of publicly traded companies in which [3D] has any business relationship." The Insider Policy "is designed to promote compliance with applicable securities laws by the Company and all of its directors, officers and employees…" and has, as general rules:

    (1)    No trading while in possession of inside information;

    (2)    No tipping or sharing non-public information with others or to recommend to anyone the purchase or sale of any securities;

    (3)    Pre-clearance procedures that require all personnel to whom the Insider Policy applies to pre-clear each transaction involving the Company's securities; and

    (4)    "Blackout" periods that require designated persons subject to the pre-clearance procedures to refrain from trading during certain periods following the announcement of the Company's quarterly financial results.

77.    Furthermore, the Board of Directors has adopted an Amended Audit Committee Charter, effective as of May 15, 2012, with the purpose of assisting the Board in its oversight duties, accounting and reporting practices, and the adequacy of the Company's financial and accounting policies, among other duties. The Audit Committee Charter provides additional duties with respect to the Audit Committee members, consisting of Defendants Curran, Moore and Van Riper (collectively, the "Audit Committee Defendants"). The additional responsibilities include, *inter alia*:

    a.    Review the periodic reports of the Company with management of the Company, the internal auditor and the independent auditor prior to filing of the reports with the Securities and Exchange Commission;

    b.    Review with management, the independent auditor and the internal auditor the Company's and the Independent Auditor's assessment of the effectiveness of its internal controls;

c.    Review with management of the Company and the independent auditor at the completion of the annual audit:

    i.    the Company's annual financial statements and related footnotes;

    ii.    the independent auditor's audit of the financial statements and its report thereon;

    iii.    the independent auditor's report on internal controls;

    iv.    any significant changes required in the independent auditor's audit plan;

    v.    any serious difficulties or disputes with management of the Company encountered during the course of the audit, including any restrictions on the scope of their work or access to required information;

    vi.    significant findings during the year and management's responses thereto; and

    vii.    other matters related to the conduct of the audit which are to be communicated to the Committee under generally accepted auditing standards;

d.    Review with management of the Company and the independent auditor at least periodically the Company's critical accounting policies;

e.    Review disclosure in the Company's financial statements and periodic reports of transactions between the Company and officers and directors, or affiliates of officers or directors, or transactions that are not a normal part of the Company's business; and

f.      Review with management of the Company at least periodically the Company's principal financial policies.

**BREACHES OF DUTIES**

78.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to 3D and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the 3D, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of 3D, the absence of good faith on their part, and a reckless disregard for their duties to 3D and its shareholder that the Individual Defendants were aware or should have been aware posed a risk of serious injury to 3D.

79.     The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

80.     Due to Defendants' illegal actions and course of conduct, the Company is now the subject of a securities class action that alleges violations of the federal securities laws and will cause the Company to expend significant sums of money for the defense and potential settlement of the lawsuit.

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

83.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

84.     Defendants knowingly permitted and participated in the release of improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conduct complained of herein.

85.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**DAMAGES TO THE COMPANY**

86.     The Company has been, and will continue to be severely damaged and injured by Defendants' misconduct. Such harm includes, but is not limited to:

a.   Costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

b.   Substantial loss of market capital;

c.   Costs already incurred defending against the pending securities class actions, and potential liability therefrom; and

d.   The Company's business, goodwill and reputation with its business partners, regulators, and shareholders have been gravely impaired.

87.    The actions complained of herein have irreparably damaged 3D's corporate image and goodwill.  For at least the foreseeable future, 3D will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that 3D's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

88.    Plaintiff brings this action derivatively in the right and for the benefit of 3D to redress injuries suffered, and to be suffered, by 3D as a direct result of Defendants' breaches of fiduciary duties and unjust enrichment.  3D is named as a nominal defendant solely in a derivative capacity.

89.    Plaintiff will adequately and fairly represent the interests of 3D in enforcing and prosecuting its rights and was a shareholder of 3D common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

90.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act for reasons detailed below.

91.     At the time this action was commenced, the Board of 3D consisted of the following ten directors: Defendants Reichental, Hull, Van Riper, Loewenbaum, Kever, Welke, Moore, Diamandis, Humes and Curran.

**Defendants Reichental and Hull Are Recognized
as Non-Independent by the Company**

92.     Defendant Reichental has been a director, President and Chief Executive Officer of 3D since September 2003, having received $6,640,675 in total compensation[8] from 3D in 2014 and $10,898,483 in 2013.  Defendant Reichental derives significant income from, and his primary source of income is, his employment as President, CEO and director of 3D, and as such, his reputation is inextricably bound to his role at 3D.  As acknowledged in the Company's most recent Proxy, dated March 24, 2015 and filed with the SEC on April 1, 2015, Defendant Reichental is not independent and therefore cannot independently consider any demand to sue himself for breaching his fiduciary duties to 3D, as that would expose him to liability and threaten his livelihood.

93.     Defendant Hull is the founder of 3D and has been a member of the Board since the 1993.  Defendant Hull has also been the Executive Vice President since 2000 and the Chief Technology Officer of the Company since 1997.  Within the last five years, Defendant Hull has worked in a variety of executive officer positions with 3D, including Chief Executive Officer, Vice Chairman of the Board of Directors, President and Chief Operating Officer.  In 2014, Defendant Hull received total compensation[9] of $2,291,827.  As acknowledged in the Company's most recent Proxy, dated March 24, 2015 and filed with the SEC on April 1, 2015, Defendant Hull is not

---

[8] Total compensation includes Defendant Reichental's salary as an officer and a director of the Company, as well as any bonus, stock awards, non-equity incentive plan compensation and all other compensation.

[9] Total compensation includes Defendant Hull's salary as an officer and a director of the Company, as well as any bonus, stock awards, non-equity incentive plan compensation and all other compensation.

independent and therefore cannot independently consider any demand to sue himself for breaching his fiduciary duties to 3D, as that would expose him to liability and threaten his livelihood.

**Demand is Futile as to Defendant Diamandis Because of his Continued and Extensive Business Relationship with 3D and as Co-Founder of Planetary Resources**

94.    Defendant Diamandis is not an independent director to disinterestedly consider a demand upon the Board because he has engaged in extensive business dealings with 3D in his capacity as Co-Founder and Co-Chairman of another company, Planetary Resources, Inc. ("Planetary Resources").

95.    Planetary Resources is devoted to space travel for the purpose of landing spacecraft on asteroids, extracting precious minerals such as platinum from asteroids and returning the extracted minerals to earth.  Because Planetary Resources' goals are far-fetched, highly speculative and would anyway take decades to realize if at all possible, Planetary Resources is unable to attract investment in the conventional sense.   Accordingly, Planetary Resources has been almost exclusively funded by several primary investors who have made "donations" to the company based upon philosophical support for the environmental and societal goals of the company.  Planetary Resources has extensively utilized Kickstarter campaigns to raise funds.  In essence, Planetary Resources asks companies and wealthy individuals for donations and anyone willing to pledge to its space exploration, mining and infrastructure technologies.  The Company lists approximately one dozen "investors" on its website.

96.    On June 26, 2013, 3D and Planetary Resources announced that 3D joined the core group of investors of Planetary Resources' Kickstarter campaign to develop and manufacture components of its ARKYD Series of Spacecraft.  The ARKYD Series, according to Planetary Resources, is supposed to be a space telescope and technology demonstrator that will be employed for prospecting missions looking for likely mining candidates among near-Earth asteroids while

also providing commercial Earth imaging and educational space telescope services. Planetary Resources promoted the ARKYD Series as "the most advanced spacecraft per kilogram that exists today."

97.    The Kickstarter campaign to fund the ARKYD Series initially aimed for $1 million in funding. According to 3D's 2013 Proxy statement (the "2013 Proxy"), filed on April 1, 2014, in June of 2013, 3D's Board of Directors decided to invest $1.5 million Planetary Resources. 3D's investment in the ARKYD Series put Planetary Resources substantially over its stated goal for the campaign's funding.

98.    Upon information and belief, 3D's $1.5 million investment in Planetary Resources is the largest single investment or donation made in or to Planetary Resources.

99.    3D is not an investment firm and its $1.5 million investment in Planetary Resources was a departure from 3D's business and made no sense as an investment; nor did Defendants at all explain the background or basis of the $1.5 million "investment" to shareholders. All that was announced to shareholders was a couple sentences listed in the 2013 Proxy statement, which read:

> In June of 2013, our Board of Directors approved our investment of $1,500,000 in Planetary Resources, Inc. as a collaborative partner in assisting Planetary Resources to develop and manufacture components of its ARKYD Series of spacecraft using its advanced 3D printing and digital manufacturing solutions. Dr. Peter Diamandis, Co-Founder and Co-Chairman of Planetary Resources, Inc. joined our Board of Directors in July 2013

100.    Furthermore, 3D's press release announcing the investment in Planetary Resources added nothing to explain the investment. The Company's press release entitled "3D Systems and Planetary Resources Announce Investment and Collaboration," stated, in pertinent part:

> ROCK HILL, South Carolina, June 26, 2013 – 3D Systems (NYSE:DDD) and Planetary Resources, Inc. announced today that 3D Systems has joined Planetary Resources' core group of investors and will be a collaborative partner in assisting Planetary Resources to develop and manufacture components of its ARKYD Series of spacecraft using its advanced 3D printing and digital manufacturing solutions.

101.    In the Company's press release announcing the investment, Defendant Reichental further added:

> We are excited to work very closely with Planetary Resources' engineering team to use advanced 3D printing and manufacturing technologies to increase functionality while decreasing the cost of their ARKYD spacecraft…In success, we will create the smartphone of spacecraft and transform what has been an old-style, labor-intensive process, into something very scalable and affordable that will democratize access to space, the data collected from space and off-Earth resources for scientists and the public.  We are delighted to join the Planetary Resources team.

102.    Immediately after deciding to transfer $1.5 million to Planetary Resources, in July of 2013, the Board of 3D decided to add an additional directorship to the Board and to appoint Planetary Resources' Co-Founder and Co-Chairman, Defendant Diamandis, to the newly minted directorship, bringing the total number of director positions to ten (10) altogether.  The Company gave Defendant Diamandis total compensation in the amount of $138,732 for the half year of 2013 that Defendant Diamandis was on the Board of 3D.

103.    The Board of Directors of 3D had never previously added a directorship to the board or appointed an individual to a directorship, rather than nominated and put up for shareholder vote.  Defendants did not at all explain to shareholders the background or basis of the addition of the tenth directorship or appointment of Diamandis to that directorship.

104.    The Company's press release announcing the addition of Defendant Diamandis stated:

> ROCK HILL, South Carolina July 24, 2013– 3D Systems (NYSE:DDD) announced today that its Board of Directors has elected Peter H. Diamandis a director of the company.
>
> Dr. Peter Diamandis is the Chairman and CEO of the X PRIZE Foundation, which leads the world in designing and launching large incentive prizes to drive radical breakthroughs for the benefit of humanity. Diamandis is also the co-Founder & Executive Chairman of the Singularity University, a Silicon Valley based

institution teaching graduates and executives about exponentially growing technologies and their potential to address humanity's grand challenges.

Diamandis has founded or co-founded many of the leading entrepreneurial companies in the exponential technologies sector including Zero Gravity Corporation, Planetary Resources, Inc. and Space Adventures. He also counsels the world's top enterprises on how to utilize exponential technologies and incentivized innovation to dramatically accelerate their business objectives. Diamandis recently co-Authored Abundance – The Future Is Better Than You Think.

105.    Defendant Loewenbaum, Chairman of the Board of Directors, added:

We are very pleased to have a person of Peter's caliber join our Board of Directors…Peter brings a unique blend of experience that we expect to enhance the range of skills and expertise within our Board of Directors.

106.    Defendant Reichental did not add much as well in describing the unprecedented addition to the Board so closely related to 3D's significant investment in Planetary Resources. Defendant Reichental stated:

The addition of Peter Diamandis to our Board underscores our commitment to implement and drive exponential strategies in every part of our business…We expect Peter's extensive experience, together with his comprehensive understanding of disruptive technologies and crowd sourcing and his incentivized innovation background, will make him a valuable addition to our Board.

107.    Due to the ongoing business relationship between 3D and Planetary Resources, Defendant Diamandis is not independent from the rest of the Board because of business dealings, in which 3D essentially donated $1.5 million to Defendant Diamandis' pet project with no reasonable expectation of repayment, let alone profit.  This huge gratuitous payment by 3D to Defendant Diamandis' benefit, coupled with the extraordinary and unnecessary addition of a directorship and appointment of Defendant Diamandis thereto inuring a financial benefit to Diamandis of over $20,000 per month during the remainder of 2013 and thereafter, left Diamandis beholding to the Company and its Board of Directors.

108.    In light of the above Defendant Diamandis is inherently intertwined between Board decisions by 3D and current and future business transactions with Planetary Resources, rendering him not independent to make such decisions.  Defendant Diamandis, as Co-Founder and Co-Chairman of Planetary Resources cannot adequately consider a demand on 3D's Board as Planetary Resources' professional relationship and future funding may and likely will be impacted by the liability incurred by Defendant Diamandis for the wrongs complained of herein in which he is liable to 3D.

**Demand is Futile as to Defendants Curran, Moore and Van Riper
as Members of the Audit Committee**

109.    Demand is futile as to Defendants Curran, Moore and Van Riper (collectively, the "Audit Committee Defendants") as the members of the Audit Committee in their failure to fulfill the responsibilities defined in the Audit Committee Charter and oversee the Board's actions and reporting practices.

110.    The Audit Committee Charter, as amended and adopted on May 15, 2012, states that the purpose of the Audit Committee "shall be to assist the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company, the adequacy of the Company's financial and accounting policies…" In particular, the Audit Committee Defendants are responsible and required to "review the periodic reports of the Company…prior to filing of the reports with the Securities and Exchange Commission."

111.    The periodic reports concerning the Company's business and prospects moving forward throughout the Relevant Period contained false and misleading information that allowed certain of the Individual Defendants to trade on the artificially inflated price of the stock.  In their capacity as members of the Audit Committee, Defendants Curran, Moore and Van Riper were charged with ensuring that these reports did not contain such information.  By allowing the periodic

results of the Company to be filled with misleading information in which the Defendants were able to personally benefit, the Audit Committee Defendants either knowingly allowed the reports to contain false information or did not properly perform their Audit Committee duties.  As such, the Audit Committee Defendants should be subject to liability and cannot independently consider a demand as members of the Board.

112.    The Audit Committee Defendants failure to properly oversee the Board's actions in disseminating false and misleading statements to artificially inflate 3D's stock price shows that these defendants are not disinterested and cannot adequately independently consider a demand.

**Demand is Futile as to Defendants Reichental, Hull, Loewenbaum, Moore,
Van Riper, Gregoire and Kever For Their Illicit Stock Sales Based on Material,
Adverse and Non-Public Information**

113.    Making a demand on Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper and Kever would be a futile and useless act as those defendants directly benefited from the wrongs and acts complained of herein and cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

114.    The Company has adopted an Insider Trading Compliance Policy (the "Insider Policy") to "provide guidance to anyone who works for 3D Systems Corporation…with respect to trading in the Company's securities."  The Insider Policy provides that all persons covered under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

115.    Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper and Kever made such illicit trades during the Relevant Period by wrongfully benefiting from the Company's artificially inflated stock price at the expense of the Company's shareholders.  Throughout the Relevant Period, the Individual Defendants misled the investing public regarding the true business

and prospects of the Company.  When the truth finally emerged, the Company's stock plummeted, but only after Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper and Kever has substantially benefited by selling significant portions of their stock at the higher prices.

116.    As such, these defendants have breached their fiduciary duties to the Company and the investing public.  Furthermore, these defendants have breached the Company's Insider Policy and substantially benefited at the expense of both the Company and its shareholders.  In light of this, Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper and Kever cannot possibly consider a demand to sue themselves for breaching these duties and any demand on these defendants would be futile act as they are not independent.  Thus, demand should be excused as to Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper and Kever.

## FIRST CAUSE OF ACTION
### Against all Defendants for Breach of Fiduciary Duties

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The Individual Defendants owed and owe 3D fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe 3D the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

119.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

120.    The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, 3D has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

122.    Plaintiff, on behalf of 3D, has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Against all Defendants for Unjust Enrichment

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of 3D.

125.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to 3D.

126.    Plaintiff, as a shareholder and representative of 3D, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

127.    Plaintiff, on behalf of 3D, has no adequate remedy at law.

## THIRD CAUSE OF ACTION
### Against all Defendants for Abuse of Control

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of 3D and the investing public by causing the Company to release information that would artificially inflate the price of the Company's stock.

Certain of the Individual Defendants then significantly profited on the false information regarding the Company's business and prospects.

130.     As such, the Defendants have abused their positions of control with the Company and are legally responsible.

131.     Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

### FOURTH CAUSE OF ACTION
### Against all Defendants for Gross Mismanagement

132.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.     Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.   Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

134.     Through the wrongful acts complained of herein, the Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

135.     By committing the misconduct alleged herein, Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of 3D's affairs and in the use and preservation of 3D's assets.

136.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

caused 3D to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to 3D, thus breaching their duties to the Company.

137.    As a result, Defendants grossly mismanaged 3D and should be liable to the Company for the resulting damages.

### FIFTH CAUSE OF ACTION
### Against Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper, Gregoire and Kever for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper, Gregoire and Kever, throughout the Relevant Period, engaged in the sale of Company stock while in possession of material information that had yet to be released to the investing public.  Furthermore, these defendants participated in the scheme to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

140.    The information that was yet unreleased concerned the Company's ability to increase the capacity of its metal printing business, the demand for its consumer products, the value of multiple companies it was acquiring, and its expected earnings.

141.    This proprietary, non-public information concerning the Company's business and prospects was known by the Defendants who sold all or part of their shares throughout the Relevant Period and was done for their own self-interests, at the expense of 3D and the investing public.

142.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, Defendants Reichental, Hull, Loewenbaum,

Moore, Van Riper, Gregoire and Kever breached their fiduciary duties of good faith and loyalty to the Company.

143.     As such, Defendants Reichental, Hull, Loewenbaum, Moore, Van Riper, Gregoire and Kever are legally responsible to the Company for the significant profits they received from the sales of their stock in 3D.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties and unjust enrichment;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 3D and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and committee charters taking such other actions as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- A proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- A proposal to strengthen the Company's internal reporting and financial disclosure controls;

- A proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- A proposal to ensure the accuracy of the qualifications of 3D directors, executives and other employees;

- A proposal to require an independent Chairperson of the Board;

- A provision to appropriately test and then strengthen the Company's internal operational control functions;

C.    Awarding to 3D restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by and through its counsel of record, requests a jury for all issues triable in the above-referenced matter.

**[SIGNATURE PAGE TO FOLLOW]**

Respectfully submitted,


/s/ Brian C. Duffy
Brian C. Duffy (Fed. ID No. 9491)
Thomas A. Limehouse, Jr. (Fed. ID No. 12148)
DUFFY AND YOUNG, LLC
96 Broad Street
Charleston, South Carolina 29401
Telephone: (843) 720-2044
Facsimile: (843) 720-2047
bduffy@duffyandyoung.com
tlimehouse@duffyandyoung.com

and

Edward W. Miller
Joshua M. Lifshitz
*Pro Hac Vice* Application Forthcoming
LIFSHITZ AND MILLER
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*

September 18, 2015