**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | |
|---|---|
| **JAMES NALLY, derivatively on behalf of 3D SYSTEMS CORPORATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ABRAHAM N. REICHENTAL, DAMON J. GREGOIRE, CHARLES W. HULL, DANIEL S. VAN RIPER, G. WALTER LOEWENBAUM, II, JIM D. KEVER, KAREN E. WELKE, KEVIN S. MOORE, PETER D. DIAMANDIS, WILLIAM D. HUMES, and WILLIAM E. CURRAN,**<br><br>**Defendants,**<br><br>**and**<br><br>**3D SYSTEMS CORPORATION,**<br><br>**Nominal Defendant.** | **Civil Action No. 0:15-3756-MGL**<br><br><br><br>**VERIFIED FIRST AMENDED**<br>**SHAREHOLDER DERIVATIVE**<br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

By and through his undersigned counsel, Plaintiff James Nally ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant 3D Systems Corporation ("3D" or the "Company") against certain officers and/or directors of the Company for breaches of fiduciary duties. Plaintiff alleges upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (b) news articles and shareholder communications, press releases, and other publications disseminated by the Company; (c) postings on 3D's website concerning the Company's public statements; and (d) pleadings, papers, and any documents filed

in the related pending securities fraud class action lawsuit captioned *KBC Asset Management NV v. 3D Systems Corporation, et al.*, Civil Action No. 0:15-cv-02393-MGL (the "Securities Action"). Plaintiff believes that through reasonable discovery, substantial additional evidence will exist for the allegations and claims set forth herein.

## SUMMARY

1.     Nominal Defendant 3D is a holding company that owns companies that manufacture and sell three-dimensional ("3-D") printing products and services. The Company refers to itself as a leading global provider of 3-D printing solutions.

2.     In recent years, competitors began to offer products that were distinct from, and in many cases superior to, products offered by the Company. Defendant 3D did not keep up with the advances being made in the field but created a false perception of growth, development, and progress by acquiring companies. Between 2011 and May 2015, 3D acquired over forty (40) 3-D printing related companies, at a cost of over $700 million.

3.     Beginning in October 2013 and continuing through the present (the "Relevant Period"), Defendants caused 3D to release false and misleading information in its public filings promoting the Company's business and prospects to investors in order to artificially inflate the true value of the Company's stock.

4.     Because 3D's portfolio of disparate companies and products was unwieldly and the Company was not equipped to integrate its disparate acquisitions, 3D was not greater than the sum of its parts. 3D's buying spree did not lead to significant advances in development or sales of any particular product. However, the Individual Defendants, as defined herein below, falsely attributed the increase in 3D's total sales resulting from its massive acquisitions of companies with existing sales, as if it were indicative of advances in product development and demand,

which it was not.

5.      By misleadingly attributing increased total sales to increasing demand for the Company's products, the Individual Defendants also falsely presented the increased total sales as an indication that sales would continue to grow, when in fact the increased sales were merely the added sales from the newly acquired companies being bought up by 3D.

6.      For instance, on October 29, 2013, during a conference call discussing the Company's third quarter earnings for 2013, Defendant Abraham N. Reichental, the Company's Chief Executive Officer ("CEO"), President, and director, misleadingly represented that, "record revenue for both the quarter and the year, . . . . this is a unique moment for our business.  The level of inbound interest is at an all-time high across both the advanced manufacturing and consumer sectors," though the increased sales were simply a reflection of 3D having bought more companies with existing sales.

7.      As Defendants touted their illusory increase in sales, 3D's breakneck pace of acquisitions caused the Company's resources to become spread too thin to properly operate and integrate the companies and products it acquired.  The more disparate companies and products 3D acquired, the more debilitating grew 3D's operating inefficiencies and manufacturing capacity issues.

8.      The manufacturing capacity shortages were exacerbated by the Company's dependence on Phenix Systems ("Phenix"), a French company recently acquired during 3D's aggressive acquisition spree.   The Company planned on using Phenix as its primary manufacturer for 3D's direct metal printers, but Phenix was a small company and it was unable to increase its manufacturing capacity in order to properly fill orders.  The inability to increase manufacturing capacity resulted in a loss of critical sales.

3

9.    The Company's inability to increase manufacturing capacity led to inventory control problems and increased pressure to increase revenue by booking orders that it knew it would not be able to fill.    Throughout the Relevant Period, Defendants made false and misleading statements touting the Company's ability to increase its manufacturing capacity to meet rising demand.    Though he knew full well the Company lacked the resources to significantly increase manufacturing capacity, on October 29, 2013, Defendant Reichental falsely stated that the Company "decided to triple [its] manufacturing capacity over the next 12 months."    Defendant Reichental also falsely represented the Company's acquisitions, manufacturing capacity, and positive sales throughout the Relevant Period.

10.    Defendants continued the flow of false and misleading information in 2014.    For instance, on February 28, 2014, in the Company's fourth quarter for 2013 earnings conference call with investors and analysts, Defendant Reichental described several recent acquisitions with the expectation that they would cause 3D to lead or result in 3D leading in several market categories.    Defendant Reichental stated "we believe that direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years and our plan is to as much as quadruple sales over the next 12 months to 18 months."    Defendant Reichental knew that there was no basis in reality for such projections either in terms of demand or manufacturing capacity.

11.    Within hours of Defendant Reichental's wildly false and misleading projections, the Company's stock jumped 6.8%, to close at $79.77 on February 28, 2014, the same day as Defendant Reichental's above-cited false statements concerning the Company's business prospects moving forward.

12.    On April 29, 2014, Defendant Reichental continued to falsely promote the

Company's prospects in the Company's first quarter 2014 earnings conference call with analysts and investors by falsely stating that the Company "plan[ned] to quadruple direct metal printer sales over the next 12 months to 18 months," an impossibility given the realities of both actual demand for 3D's products and the known limitations of 3D's manufacturing capacity.

13. As a direct consequence of the above false and misleading statements building investor anticipation of increased sales and profits, and other statements and representations of a like nature, the Company's stock price tripled during the Relevant Period. By the end of the Relevant Period, after the months-long campaign of false and misleading hype issued by the Individual Defendants, 3D's market capitalization reached approximately twenty times revenues, over two or three times the capitalization-to-revenues ratios of other competing companies.

14. As described herein, 3D's disproportionately high market capitalization and correspondingly high stock price (in relation to total revenues) was not the result of any technologically superior 3-D printer product or a 3-D printer or product that was a leader in its category. Nor was the tripling of 3D's share price and disproportionately high market capitalization the result of any synergy between the dozens of companies 3D acquired in a short period of time. Rather, the spike in 3D's share price resulted in large part from self-created false and misleading media hype primarily disseminated by then-President and CEO, Defendant Reichental, and then-Chief Financial Officer ("CFO") Defendant Damon Gregoire.

15. In July, 2014, when the true nature of the Company's prospects were revealed, 3D's stock price began to plummet and currently trades around $12 to $14 per share, as opposed to a high of $96.42 during the Relevant Period while the Defendants falsely pumped and promoted the Company's future prospects and opportunities.

16. The pump and dump scheme originated at the highest levels of the Company.

The Individual Defendants at the helm of the Company were the primary beneficiaries of the artificial inflation of the Company's stock. Defendants Loewenbaum, Moore, Reichental, Hull, and Gregoire sold significant portions of their 3D stock, reaping over $31 million on artificially inflated stock prices.

17.     The Individual Defendants' sales of 3D stock were suspicious in timing and amount and made while Defendants were in possession of material, non-public information about the Company's true condition and future prospects. In less than one week after the above-described false statements in the February 28, 2014 earnings conference call drove the Company's stock price up dramatically, Defendants Loewenbaum and Reichental sold over $9 million of their 3D holdings at artificially inflated share prices.

18.     During the Relevant Period, Defendant Loewenbaum—Chairman of the Board and Chairman of the Executive Committee—sold 151,479 shares at artificially inflated prices, reaping proceeds of $11,244,499; Defendant Moore—Chairman of the Corporate Governance and Nominating Committee and member of the Audit and Executive Committees—sold 15,000 shares at artificially inflated prices, reaping proceeds of $1,026,600; Defendant Reichental sold 144,000 shares at artificially inflated prices, reaping proceeds of $8,814,417 at artificially inflated prices; and Defendant Damon Gregoire—the CFO and Executive Vice President of Mergers and Acquisitions—sold 162,500 shares at artificially inflated prices, reaping proceeds of $8,928,850.

19.     Defendants also capitalized upon their inside knowledge that the Company's stock had been artificially inflated through the above-described false and misleading statements, by causing 3D to offer 5,950,000 shares of its stock for sale to the public on May 29, 2014, netting nearly $300 million at artificially inflated prices.

20.    As a result of the above-described false and misleading statements, the Company has become the subject of the Securities Action, which was filed on June 12, 2015. The Class Period in the Securities Action runs from October 29, 2013, through May 5, 2015. Defendants Reichental, Gregoire, and Hull, who have been the most vocal in issuing false and misleading statements regarding the Company, are defendants in the Securities Action.

21.    On July 31, 2014, the Company issued a press release announcing its financial results for the second quarter and six months of 2014. In that press release, it was further revealed that the Company's revenue was off the mark from that which Defendants had been claiming throughout the Relevant Period. As a result, 3D's stock fell approximately 11% and closed at $47.93 per share on August 1, 2014.

22.    The Company's true prospects were further revealed on October 22, 2014, when 3D issued a preliminary report announcing its expected third quarter results for 2014, showing even lower full-year revenue and earnings. In that press release, the Company stated the problems were related to capacity constraints for its direct metal printers. On this news, 3D's stock continued to fall, dropping approximately 15%, and closed at $36.67 per share on October 22, 2014.

23.    The Director Defendants, as defined herein below, were aware that Defendants Reichental, Gregoire, and Hull had made repeated false representations to the investing public, making millions for themselves along the way. The Director Defendants attempted to regain a bit of corporate credibility by forcing Defendant Reichental to resign as CEO and President and as a director. The resignation was presented to the public as voluntary but was in fact forced and for cause, as evidenced by the facts that Defendant Reichental did not receive any severance pay pursuant to his employment agreement and the lack of any replacement CEO at the time of

Defendant Reichental's forced resignation. Furthermore, despite acknowledging Defendant Reichental's fraud on the public as evidenced by their forced resignation for cause, Defendants made no effort to claw back any of Defendant Reichental's compensation, bonus, or stock awards he received throughout the Relevant Period.

24.     During the Relevant Period, the Company has seen its market capitalization shrink by billions of dollars and its stock price has continued its constant downward trajectory.

25.     On July 25, 2016, the United States District Court for the District of South Carolina held that the plaintiff in the Securities Action had sufficiently alleged that the defendants engaged in a scheme to defraud the Company's shareholders during the Class Period and therefore denied the defendants' motion to dismiss and sustained the Securities Action. (*See generally* C/A No. 0:15-cv-02393-MGL, ECF No. 97.) All of the statements challenged herein were also challenged in the Securities Action.

26.     Specifically, the Court held, *inter alia*, that the plaintiff in the Securities Action adequately set forth "several alleged misrepresentations and omissions concerning 3D Systems' acquisition strategy, manufacturing capacity, product quality, sales and revenue growth projections, inventory control, and booking and shipping practices," (*id.* at 9), while further stating "[a]ssuming these statements as true, on its face, the complaint adequately pled a misrepresentation by 3D Systems regarding the state of its inventory and failure to inform fully investors of its inventory-related difficulties," (*id.* at 11). Put simply, the Court concluded that the plaintiff plausibly alleged that the defendants in the Securities Action engaged in a scheme to defraud investors. Moreover, the Court noted that Defendant Reichental's and Defendant Gregoire's insider trading was "certainly consistent with an inference that the insiders who traded during the Class Period had a motive to commit fraud." (*Id.* at 21.)

27.     As a result of Defendants' wrongful conduct in concealing material, adverse information from the investing public, Defendants have breached their fiduciary duties of loyalty, care, and good faith owed to the Company and its shareholders.

28.     Demand on 3D's Board, which consists of ten members at the time this action was commenced, is futile for the following reasons, among others: (1) Defendant Reichental, the Company's CEO, was an employee–director of the Company at the time of the filing of the present action and Defendant Hull, the Company's founder, Chief Technology Officer, and Executive Vice President was and is employed by the Company and both Defendants Reichental and Hull, by the Company's own admission, are not independent; (2) Defendants Loewenbaum, Reichental, Hull, and Moore each face a sufficiently significant likelihood of liability for insider trading as they each profited from the hidden information by making trades suspicious in timing and amount while 3D stock traded at artificially inflated prices; (3) Defendants have shown their inability to be impartial in this matter by their failure to attempt to claw back any of Defendant Reichental's compensation he received throughout the Relevant Period after his resignation; (4) the members of the Audit Committee, which consists of Defendants Curran, Moore, and Van Riper, in the course of their long tenure on both the Board and the Audit Committee, were well aware of the Company's obvious problems in the areas of manufacturing capacity, quality control, inventory control, and integration of new acquisitions, and were therefore well aware of the falsity of the statements described herein; (5) Defendant Diamandis is interested because of his continued and extensive business relationship with 3D and as co-founder of Planetary Resources; (6) a majority of the members of the Board face a substantial likelihood of liability to 3D for breaching their fiduciary duties of loyalty and care by authorizing or failing to correct false and misleading statements regarding the Company as alleged herein and/or lack of

independence; and (7) the director fees received by Defendants Loewenbaum, Curran, Diamandis, Humes, Kever, Welke, Moore, and Van Riper constitute substantial material benefits that these Defendants are unlikely to jeopardize by voting to sue themselves and other members of the Company's management and Board.  Accordingly, pre-suit demand upon the Board is futile and therefore excused.

29.    The Company's stock price has not rebounded to date.  3D stock closed at $15.18 per share on December 12, 2016, a small fraction of the artificially inflated price of $96.42 to which it had been artificially driven as described above.

30.    As such, the Individual Defendants are liable to the Company for the harm suffered by it and its shareholders.

<u>JURISDICTION AND VENUE</u>

31.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Further, this Court has subject matter jurisdiction over the claims asserted herein under 28 U.S.C. § 1331, because the claims arise under and pursuant to § 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).  This action is not a collusive one to confer jurisdiction on a court of the United States that which it would not otherwise have.

32.    This Court has and may exercise personal jurisdiction in this matter over Defendants, because Defendants purposefully availed themselves to and of the benefit of the laws of the forum state and because Defendants regularly transacted and/or conducted business in the forum state, committed a tortious act in whole or in part in the forum state, and caused tortious injury in the forum state.

33.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2), 28 U.S.C. § 121, and Rule 3.01(A) of the Local Civil Rules (D.S.C.), because a substantial part of the events, omissions, wrongs, transactions, and acts complained of and giving rise to the claims asserted herein, including Defendants' involvement in the same as detailed herein, occurred in this District and Division.  Additionally, the Company is headquartered and has its principal place of business in this District and Division, and Defendants have received substantial compensation by engaging in business in this District and Division.

## THE PARTIES

34.     Plaintiff has continuously been a shareholder throughout the period of the wrongdoings complained of herein, and he is a current 3D shareholder.  Plaintiff is a citizen of Ohio.

35.     Nominal Defendant 3D is a Delaware corporation with its headquarters and principal place of business located at 333 Three D Systems Circle, Rock Hill, South Carolina 29730.  The Company was founded by Defendant Charles W. Hull in 1986 and provides 3-D digital design and fabrication solutions, including 3-D printers, print materials, and cloud-sourced custom parts. The Company operates globally, with segments of its operations in parts of the Americas, Germany, and Asia Pacific.

36.     Defendant Abraham N. Reichental ("Reichental") was a director, President, and CEO of 3D from September 2003 until October 29, 2015, when the Board forced him to resign his positions with the Company, after the Securities Action was filed, leaving the CEO position vacant.  Defendant Reichental, a director at the time of the filing of the present action, was not an independent director, as disclosed by the Company in its 2015 proxy statement, filed with the SEC on March 24, 2015 (the "2015 Proxy").  Defendant Reichental received, as CEO of the Company, compensation in the total amount of $6,640,675 in 2014 and $10,898,484 in 2013.

Upon information and belief, Defendant Reichental is a citizen of South Carolina.

37.     Defendant Charles W. Hull ("Hull") is the founder of the Company, has been a director since 1993, and has been the Chief Technology Officer since 1997, as well as Executive Vice President since 2000.  The Company admits that Defendant Hull is not an independent director as described in the 2015 Proxy.  During the Relevant Period, while in possession of material, adverse, non-public information, Defendant Hull disposed of at least 95,000 shares of his personally held 3D common stock for proceeds of almost $3.8 million at artificially inflated prices.  Defendant Hull received executive compensation from the Company in the total amount of $268,142 in 2014 and $2,773,363 in 2013.   Upon information and belief, Defendant Hull is a citizen of South Carolina.

38.     Defendant G. Walter Loewenbaum, II ("Loewenbaum") has been a director and the Chairman of the Board of the Company since 1999.  Defendant Loewenbaum is also currently a member of the Compensation Committee and the Chairperson of the Executive Committee.  Defendant Loewenbaum was appointed and served as Chairman of the Board for the past decade and a half in part due to his intimate knowledge of the business of the Company, having been an employee and a consultant of the Company from 1999 until 2002.  Additionally, Defendant Loewenbaum has business relationships with the Company by virtue of a distribution agreement for the Company's ThermoJet printers with 3D Solid Solutions, a partnership controlled by Defendant Loewenbaum.  During the Relevant Period, while in possession of material, adverse, non-public information, Defendant Loewenbaum sold 151,479 shares of his 3D common stock for proceeds of approximately $11.2 million at artificially inflated prices. Defendant Loewenbaum received $279,957 in total compensation from 3D in 2013, $279,996 in total compensation from 3D in 2014, and $367,827 in total compensation from 3D in 2015.

Upon information and belief, Defendant Loewenbaum is a citizen of Texas.

39.     Defendant Kevin S. Moore ("Moore") has been a director of the Company since 1999 and was, during the Relevant Period and at the time of the filing of the present Complaint, a member of the Audit and Executive Committees and Chairperson of the Corporate Governance and Nominating Committee.  During the Relevant Period, while in possession of material, adverse, non-public information, Defendant Moore sold 15,000 shares of his personally held 3D common stock for proceeds of over $1.0 million at artificially inflated prices.  Defendant Moore received $208,207 in total compensation from 3D in 2013, $205,246 in total compensation from 3D in 2014, and $192,827 in total compensation from 3D in 2015.  Upon information and belief, Defendant Moore is a citizen of Connecticut.

40.     Defendant William E. Curran ("Curran") has been a director of the Company since 2008 and is currently the Chairperson of the Audit Committee and a member of the Executive Committee.  Defendant Curran received $223,207 in total compensation from 3D in 2013, $217,996 in total compensation from 3D in 2014, and $202,077 in total compensation from 3D in 2015.  Upon information and belief, Defendant Curran is a citizen of New York.

41.     Defendant Peter H. Diamandis ("Diamandis") has been a director of the Company since 2013 and is currently a member of the Sustainability Committee.  Defendant Diamandis received $138,732 in total compensation from 3D in 2013, $168,746 in total compensation from 3D in 2014, and $142,577 in total compensation from 3D in 2015.  Upon information and belief, Defendant Diamandis is a citizen of California.

42.     Defendant Daniel S. Van Riper ("Van Riper") has been a director of the Company since 2004 and currently is a member of the Audit and Compensation Committees.  Defendant Van Riper received $200,207 in total compensation from 3D in 2013, $199,496 in total

compensation from 3D in 2014, and $183,577 in total compensation from 3D in 2015. Upon information and belief, Defendant Van Riper is a citizen of Florida.

43.     Defendant Jim D. Kever ("Kever") has been a director of the Company since 1996 and currently is the Chairperson of the Sustainability Committee and a member of the Corporate Governance and Nominating Committee. Defendant Kever received $162,707 in total compensation from 3D in 2013, $172,087 in total compensation from 3D in 2014, and $147,077 in total compensation from 3D in 2015. Upon information and belief, Defendant Kever is a citizen of Tennessee.

44.     Defendant Karen E. Welke ("Welke") has been a director of the Company since 2008 and is currently the Chairperson of the Compensation Committee and a member of the Corporate Governance and Nominating Committee. Defendnat Welke received $179,957 in total compensation from 3D in 2013, $187,746 in total compensation from 3D in 2014, and $162,827 in total compensation from 3D in 2015. Upon information and belief, Defendant Welke is a citizen of Minnesota.

45.     Defendant William D. Humes ("Humes") has been a director of the Company since 2014 and is currently a member of the Sustainability Committee. Defendant Humes received $196,911 in total compensation from 3D in 2014 and $156,760 in total compensation from 3D in 2015. Upon information and belief, Defendant Humes is a citizen of California.

46.     Defendants identified in Paragraphs 36 to 45 above shall be referred to as the "Director Defendants."

47.     Defendant Damon J. Gregoire ("Gregoire") has been an Executive Vice President of Mergers & Acquisitions for the Company since November 11, 2014. Defendant Gregoire was the CFO of 3D from April 25, 2007, to November 11, 2014, and he has also previously been the

14

Company's Senior Vice President & Principal Accounting Officer. During the Relevant Period, while in possession of material, adverse, non-public information, Defendant Gregoire sold 162,500 shares of his personally held 3D common stock for proceeds of approximately $8.9 million at artificially inflated prices. Upon information and belief, Defendant Gregoire is a citizen of South Carolina.

48.    The Director Defendants and Defendant Gregoire are collectively referred to herein as the "Individual Defendants" and/or the "Defendants."

## SUBSTANTIVE ALLEGATIONS

I.    **BACKGROUND OF THE COMPANY**

### A. Three Decades After Defendant Hull's Invention of the Consumer 3-D Printer, the Company Was in a Negative Position by the end of 2013

49.    The Company is a Delaware corporation that was founded in 1986 by Defendant Hull and is headquartered in Rock Hill, South Carolina. 3D, through its subsidiaries, operates as a provider of 3-D printing in the Americas and world-wide. Defendant Hull is widely recognized as the inventor of 3-D printing, having first come up with the idea in 1983 when he was using UV light to harden tabletop coatings.

50.    There are two broad markets for 3-D printing, the home commercial market for retail consumers and the metal printing market for the industrial/manufacturing sector. Home commercial 3-D printers produce an end product composed of nylon, rubber, wax, or plastic. Industrial 3-D printers, which are much larger and more expensive, produce primarily metal end products.

51.    The Company has long produced a variety of home consumer 3-D printers that are available in various configurations, which transform data input from the format generated by 3-D design software, CAD software, or 3-D scanning and sculpting devices to printed parts using

engineered plastic, nylon, rubber, wax, and composite print materials for use in Accura, DuraForm, CastForm, LaserForm, and VisiJet brand names. The Company relies heavily on the sale of materials necessary for the use of its printers, much like copy machine manufacturers rely upon the sale of printer cartridges, following the so called "razor/blade" model.

52.    Though the Company had been a notable force on the 3-D printing landscape for many years, as 3-D printing technology became more prevalent, the amount of competition facing the Company began to grow. The increased competition presented the Company with a serious threat with consumer 3-D printers and services that were often cheaper and in many instances distinct, and superior to, the technology developed by 3D.

53.    By the start of the Relevant Period, although the Company had been a trailblazer in the consumer 3-D printer industry thirty years earlier, the Company had no particularly unique consumer-retail 3-D printer technology or product (with most of the Company's consumer-retail 3-D printer patents expiring in 2014).

54.    Thirty years after its trail blazing founder, Defendant Hull, invented the first 3-D printer, by 2013 the Company was no more than one of many manufacturers of a product with no unique technology facing cost-cutting competition from significantly larger consumer 3-D printer manufacturers including Hewlett Packard, Mitsubishi, Epson, and Stratasys Ltd., along with fierce competition from numerous start-ups including Voxeljet AG, Formlabs, Printrbot, Solidoodle, and other home consumer 3-D printer manufacturers, as well as cost-cutting competitors from China.

55.    Nor was there any indication of growing consumer loyalty or satisfaction with 3D's consumer printers. The surest indication of consumer utilization of and satisfaction with a printer of any kind is the level sales of the support materials necessary for its operation. At the

16

start of the Relevant Period, 3D's material sales per printer were in decline and continued to decline thereafter.

56.    Absent a technological or cost-cutting breakthrough or some other dramatic positive development, by 2013 the above factors indicated that the Company was a consumer 3-D printer manufacturing company in decline.

**B. The Company's Entry into 3D Industrial Metal Printer Manufacturing and Massive Acquisition Spree of Consumer Printer Manufacturing Companies**

57.    Lacking any particularly novel technology or design ideas, the Company attempted to buy its way to the front of the 3-D line by buying other 3-D companies.

58.    In June of 2013, the Company for the first time entered the industrial 3-D printer business (also referred to herein as "direct metal printing" or "metal printing"), by acquiring Phenix Systems ("Phenix"), a French direct metal printer manufacturing company with small gross revenues of $10 million, whose sales had been decreasing over the past four years while its operating losses had been increasing.

59.    Phenix's manufacturing capacity reflected its small size and Phenix was not in a position to rapidly increase its manufacturing capacity.  Though the Company had a sales force and marketing resources that could help sell Phenix's product, the Company had no organic resources that could expand Phenix's manufacturing capacity to meet the increased demand that the Company could create for Phenix's industrial metal printers.

60.    Competing against larger companies devoting far more resources to research and development than Phenix—such as EOS, Arcam, EXONE, Renishaw, Realizer, Concept Laser, SLM, Mitsubishi, Hewlett-Packard, Epson, and other large 3-D industrial metal printer manufacturers in China—Phenix neither had nor claimed to have any unique technology or product.

61.     As a result of Phenix's above obvious negative attributes, including its lack of a unique product, tepid and declining sales, and ongoing operating losses, the Company was able to acquire Phenix at a cost of only two times gross revenues.  At the time of this acquisition, the Company's stock was selling for a multiple of twenty times its gross revenues.

62.     Though the Company did not develop any advances in either function or form of its standard industrial 3-D metal printer technology or increase Phenix's manufacturing capacity, the Company allocated significant sales and marketing resources to increasing sale orders for Phenix industrial 3-D metal printers.

63.     Unlike consumer 3-D printers, industrial 3-D metal printers are typically built to the highly particularized specifications of the purchasing manufacturer.  For this reason, expanding the manufacturing capacity of an industrial 3-D metal printer manufacturer requires the hiring of highly experienced and trained personnel capable of intaking the customer's specifications and translating that to the engineering and manufacturing personnel executing the end-user's specifications prior to shipment of the printer to the industrial customer.  Due to the 'made-to-order' nature of large industrial 3-D metal printers, increasing Phenix's manufacturing capacity involved much more than simply purchasing more printer manufacturing machines.  It was clear to any minimally informed Company officer, employee, or director that it would take years to significantly increase the manufacturing capacity of the small French company the Company had acquired.

64.     Because Defendants increased sales of Phenix industrial 3-D metal printers but did not significantly expand the manufacturing capacity of its Phenix division, the Company was unable fill orders for 3-D metal printers that it was generating.  Phenix represented virtually the entire capacity of the Company to manufacture industrial 3-D metal printers.  Due to its small

size, however, Phenix was not prepared to engage in the large-scale production necessary to fill the sales that the Company generated and was unable to increase its manufacturing capacity at the speed necessary to fill the orders in anywhere near a timely fashion. The Company's Phenix division fell so far behind in filling orders for industrial 3-D metal printers that it was impossible for it or the Company to catch up. In its industrial 3-D metal printer business, throughout the Relevant Period, the Company was encountering severe manufacturing shortcomings that prevented it from meeting that demand.

65.     The problems filling orders experienced by the Company's Phenix industrial 3-D metal printing division were dramatic, obvious, and well known to any minimally informed director and obvious to the members of the Company's Audit Committee.

66.     Even after the Company's structural inability to timely fill orders for industrial 3-D metal printers became obvious, the Company continued to obtain sales orders that it knew it could not fill. Employees were directed to tell industrial 3-D metal printer customers that the Company would deliver their orders within six to twelve weeks, when in reality, the machines would be quarters away from delivery due to the manufacturing capacity problems. Defendants ultimately would wait and see which customers would cancel their orders and then decide which were most important for the Company to fill.

67.     By accepting and booking orders they knew the Company could not fill, the Company was able to manipulate the books to create unrealistic revenues projections for future quarters.

68.     The above described 'cooking of the books' took place with the knowledge of and at the direction of the Company's highest executive officers, driven by Defendant Reichental. As described below, when Defendant Reichental's fraud became fully known to the Company's

Board, some of whom were co-beneficiaries, the Board made no effort to recoup the profits Defendant Reichental made on his illicit scheme to inflate the Company's share price.

69.     The manufacturing capacity problems also hindered relationships with the Company's resellers.  The Company could not fulfill resellers' industrial 3-D metal printer orders due to capacity shortages.  Compounding the Company's problems in its industrial 3-D metal printer division, many of the industrial metal printers that were available and shipped had not been fully individualized to the specifications of the intended industrial end user and were otherwise not ready for sale in many ways.  As a result, many of the direct metal printers sold by the resellers were ultimately returned by consumers, and the Company suffered a loss of credibility in the marketplace.

70.     At the same time that the Company was attempting to expand its industrial 3-D metal printer business, the Company attempted to reverse its lack of innovation and loss of market share in the consumer 3-D printer business by acquiring numerous existing consumer 3-D manufacturers and introducing new consumer products.  From 2008, and particularly 2011 to 2015, the Company engaged in an acquisition spree in which the Company spent over $700 million to acquire over forty (40) 3-D printing related companies.

71.     The acquisition spree lacked a coherent synergistic strategy.  As a result, the Company experienced 'reverse-synergy' and the whole was actually less than the sum of the parts.  Rather than improving efficiency, productivity, innovation, and cost, the Company's uncoordinated acquisition spree created an amalgam of unwieldly disparate companies resulting in operating inefficiencies, rising expenses, and costly inventory write-offs that would negatively impact the Company's bottom line.

72.     The Company's massive non-strategic collection of newly acquired companies

resulted in thinly stretched operations lacking centralized efficient inventory control.  During the Relevant Period, the Company incurred costly inventory losses, aging obsolete inventory, and associated problems relating to lack of proper inventory control of its mainstay consumer 3-D printer operations.

73.     The Company struggled with its obsolete Oracle software inventory system requiring manual entry by employees at its corporate headquarters in Rock Hill, South Carolina, which consistently showed inventory was on hand, when in fact the parts could not be located. By January 2014, when the Company conducted its annual physical inventory count to verify the amounts reported in the Oracle system, the count failed to account for $2.5 million dollars in inventory, which was increased further to $3 million in a subsequent recount.

74.     The inventory problems were not limited to the Company's corporate headquarters.   Several of the companies that were acquired by the Company during its acquisition spree had issues with the accuracy of inventory counts and trouble accounting for the value of inventory.

75.     These pervasive inventory problems were not effectively addressed and ameliorated during 2014 and led to an inventory write-off, decreasing the gross profit margin of the Company.  By July 31, 2014, Defendants announced that the Company's gross profit margins had decreased, due to "the absorption of a one-time inventory write off from our aggressive shift to multiple new products, which accounted for a 1.3 percentage point compression."

76.     As the Company struggled with its pervasive inventory problems in its mainstay consumer 3-D printer manufacturing business, quality control also emerged as a major problem and the Company experienced increasing negative consumer feedback regarding the quality of the Company's consumer 3-D printers (as indicated by the declining materials orders detailed

above).

77.    Because the companies that 3D acquired in its $400 million buying spree lacked synergy, including in the area of research and development, the Company lagged in design and development even as it pushed to introduce new products to its mainstay commercial 3-D printer lines.  During the Relevant Period, the Company's consumer printers were plagued by problems requiring multiple software 'corrective patches' and upgrades.  Beta testers consistently returned negative feedback to the Company, as did the social media space devoted to the Company's products.  As a result of routine machine malfunctions, the percentage of units returned by dissatisfied consumers spiked during the Relevant Period.

78.    During 2014 and thereafter, as the Company's Phenix division was pushed to fill orders beyond its manufacturing capacity, quality control suffered in that division as well, with increasing serious negative consumer feedback regarding both the Company's industrial 3-D metal printers.

79.    In sum, the Company's acquisition spree, including its entry into industrial 3-D metal printer manufacturing, was a massive illusion in which a collection of companies purchased for an average price of two times gross revenues, was presented as a 3-D printer powerhouse worth a multiple of twenty times revenues.

80.    As detailed below, Defendants fanned the flames of artificially inflated investor expectations as long as possible, while cashing out to the tune of tens of millions of dollars. Defendants did so until the truth was ultimately revealed and the Company's stock dropped tenfold, from twenty times revenues, which Defendants hyped as the collective value of the sum of the disparate companies acquired by 3D, to less than the two times gross revenues, which is far closer to the $700 million purchase price of the assortment of companies the Company

patched together into an unwieldly mass.  As became increasingly obvious to the Director Defendants, the Company was unable to integrate its holdings into a sum greater than the parts. The Company's stock dropped from over $90 per share and routinely trades at approximately $13 per share today.

## II.     THE FALSE AND MISLEADING REPRESENTATIONS MADE BY DEFENDANTS THROUGHOUT THE RELEVANT PERIOD

81.     Defendants represented to investors that their $700 million acquisition spree exponentially increased the value of the Company's collective products and services, while also increasing the Company's manufacturing capacity in order to meet the increased demand. Defendants convinced investors that by virtue of its acquisitions, the Company had created a sum larger than its parts in areas of product development, sales, distribution and manufacturing, and overall prospects for the future.  In short, Defendants convinced investors that by virtue of synergies, the Company's collection of numerous acquisitions purchased at an average price of two times gross revenues was collectively worth twenty times the collective gross revenue of the combined whole.

82.     The false and misleading statements resulted in the artificial inflation of the Company's stock price, while in reality 3D was facing significant undisclosed problems on multiple fronts.

83.     During the Relevant Period, the Company consistently stated that its rapid expansion would generate dramatically increased profits through increased sales that could be supported by increased manufacturing capacity.  In truth, the Company was unable to effectively integrate the systems and operations of the many companies it had recently acquired.  Though spending a great deal of time, effort, and money towards that goal of integrating the dozens of companies 3D had acquired, the unwieldly amalgam of disparate companies created operating

inefficiencies, decreased productivity, and generated increased operating costs for 3D.  As a result of its non-strategic over-acquisition of companies, the Company grew to the point where it was spread too thin to effectively function as a direct result of its aggressive acquisitions.

84.     During the Relevant Period, Defendants caused 3D to release false and misleading statements in its public filings with the SEC promoting the Company's business and prospects to investors in order to artificially inflate the true value of the Company's stock.  This flow of false and misleading information was disseminated despite Defendants being informed that the Company was experiencing the pervasive operational and inventory problems resulting from its un-strategic aggressive acquisitions detailed herein.

85.     Throughout the Relevant Period, Defendants consistently touted direct metal printers as being in high demand while also reassuring consumers and analysts alike that the Company would be able to increase its manufacturing capacity to meet strong demand, when there was no basis for these statements to be made, as, unbeknownst to the public, the Company was encountering severe manufacturing shortcomings that prevented it from meeting that demand.

86.     As the Company's Phenix division for industrial 3-D metal printers continued to be unable to fill its orders, its limited staff rushed jobs and shipped industrial metal printers that were not fully refined to the purchasers' specification or otherwise ready for use in many ways.  As such, many of the direct metal printers sold by the resellers were ultimately returned by consumers.

87.     Despite the above obvious facts, of which Defendants were painfully well aware, in a July 15, 2013 press release, Defendants misrepresented the Company's acquisition of the industrial 3-D metal printer Phenix—a company flat-lined at $10 million gross sales for four

years with no innovative technology, lacking the manufacturing capacity to timely fill orders for significantly more than gross orders of $10 million per year—as having positioned the Company, "at the heart of these rapidly growing direct manufacturing opportunities."  The press release added the claim that the Phenix acquisition "represents a true game-changer that empowers our customers to manufacture the future."

88.    Rather than admit to the lack of manufacturing facilities, unfilled orders, and dissatisfied industrial customers, Defendant Reichental represented that the Company was doing fine and positioned to do even better, in its new industrial 3-D metal printer business.  In an October 29, 2013 conference call with analysts and investors, Defendant Reichental stated that: "we sold out our current direct metal printer manufacturing capacity and decided to triple our manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct-metal 3-D printer models."  This was a knowingly false statement since it was impossible for the Company to triple its industrial 3-D metal printer manufacturing capacity in 12 months.

89.    Though the Company was dependent upon its Phenix division for virtually all of its industrial 3-D metal printer manufacturing, by December 2013, Phenix was unable to fill existing orders, yet in a December 3, 2013 press release the Company falsely represented:

> Immediate availability of the ProX 300 direct metal printer, the only industrial grade direct metal platform that was specifically designed for the most demand[ing] manufacturing floor conditions, delivering high density, metal printed parts from a large choice of materials and to very accurate precision.  The ProX 300 is the first Phenix system to be rebranded as part of [3D Systems'] rapidly expanding [direct metals] 3D printers family.

90.    The Company falsely added that it was also "immediately beginning to ship" its rebranded ProX 100 and ProX 200 direct metal printers acquired in the Phenix deal.  In reality, the Company was experiencing severe, undisclosed manufacturing problems that rendered such

statements false and misleading since Phenix was a small company with very limited manufacturing capacity that could not be rapidly significantly increased by the Company.

91.     Because the Company's undisclosed inventory control issues persisted throughout the Relevant Period, on August 6, 2014, the Company was forced to take an inventory write-off in the second quarter of 2014.  However, Defendants falsely attributed this second write-off to "the numbers of new [product] launches that we had" and "manufacturing facility consolidations," in an August 6, 2014 statement from Defendant Gregoire falsely concealing the Company's inventory problems.

92.     On October 29, 2013, Defendants caused the Company to issue a press release titled "3D Systems Reports Q3 Results," in which Defendants promoted the Company's prospects and strategy for growth.  The press release stated, in relevant part:

> ROCK HILL, South Carolina – October 29, 2013 - 3D Systems Corporation (NYSE: DDD) announced today that its third quarter revenue grew 50% from the prior year to a record $135.7 million on a 76% increase in printers' and other products revenue and 30% overall organic growth, resulting in GAAP earnings of $0.17 per share and non-GAAP earnings of $0.26 per share.
>
> Gross profit increased 52% and gross profit margin expanded 80 basis points to 52.6%, contributing to GAAP net income of $17.7 million, and non-GAAP net income of $26.2 million, representing a 44% improvement over the 2012 quarter.
>
> For the nine months 2013, revenue grew 42% to $358.6 million, on an 81% increase in printers and other products revenue and 27% organic growth, resulting in GAAP earnings of $0.34 per share and non-GAAP earnings of $0.66 per share. Gross profit increased 46% and gross profit margin expanded 120 basis points to 52.3%.
>
> Third Quarter 2013 Revenue Highlights (compared to 2012 quarter):
> •  3-D printers and other products revenue increased 76% to $59.8 million.
> • Print materials revenue grew 30% to $33.2 million.
> • Services revenue rose 38% to $42.7 million.
> • Healthcare revenue grew 39% and contributed $16.9 million to our
>   total revenue.
> • Consumer solutions contributed $13.5 million to our total revenue.

93.     In the press release, Defendant Reichental reported that the Company experienced a second straight quarter with record revenue from printer unit sales as well the decision to rapidly increase the development of several products, channels, and technologies, further continuing the promotional scheme.

94.     Additionally, the press release stated that the Company was in good position to meet consumer demand for the Company's products.  To explain how the Company would meet this increased consumer demand, the press release cited increased manufacturing capacity resulting largely from the Company's slew of new acquisitions.

95.     In a conference call with analysts and investors regarding the October 29, 2013 press release, Defendant Reichental noted that the Company experienced a "record revenue quarter on unprecedented printer units demand that more than tripled last year's unit sales." Further, Defendant Reichental falsely represented that the Company was tripling its manufacturing capacity over the next 12 months in order to keep up with the strong demand for the Company's direct metal printers.  Defendant Gregoire echoed the same sentiments to analysts during the conference call, while also assuring them that despite the Company having higher operating expenses, "[w]e absolutely don't expect gross profit margin pressure in expanding our gross profit margin . . . ."  In reality, there was no basis for either Defendant Reichental or Gregoire to make these claims.

96.     As a result of 3D's October 29, 2013 false and misleading press release and conference call associated with quarterly earnings reports: (1) the Company received high praise from analysts, and (2) the Company's stock jumped 300% in nine months, soaring to $92.93 on December 1, 2013, from $32.24 per share on March 1, 2013.  Currently, the Company's stock trades at approximately $13 per share.

97.    As more fully detailed in the "Illegal Trades Made Throughout the Relevant Period" section below, those at the very top level of the Company, the CEO, CFO, the Company's founder, the Chairman of the Board, and the longest serving director and member of the Audit Committee—Defendants Reichental, Hull, Loewenbaum, Moore, and Gregoire—took advantage of the artificially inflated stock price resulting from the unrealistic projections and statements. As the false and misleading statements artificially inflated the price of the Company stock, Defendants sold significant shares of their 3D stock, reaping over $31 million dollars in proceeds while failing to disclose material, adverse, and non-public information.

98.    After the above false and misleading statements on October 29, 2013, and resultant increase in 3D's stock price, between November 5, 2013, and November 15, 2013, Defendants Gregoire, Moore, and Loewenbaum reaped nearly $11 million in proceeds from the sale of their 3D stock. On December 13, 2013, Defendant Reichental reaped over $2 million in proceeds from sales of the Company's stock at artificially inflated prices.

99.    On January 15, 2014, Defendant Reichental represented the Company at the Needham Growth Conference, which presented an opportunity to again falsely tout the Company's growth and acquisition strategy. During the Needham Growth Conference, Defendant Reichental falsely stated that the Company had the ability to "quickly leverage" its new acquisitions and grow revenue from a large quantity of recently announced products. Defendant Reichental also reiterated that the Company was "very happy" with how the acquisition strategy was proceeding and that most of the new acquisitions were "completely in the Company and [were] all one Company right away."

100.    On February 5, 2014, the Company announced preliminary financial results for the full year 2013. While in the range of previously raised revenue guidance, the results showed

substantially compressed earnings and a lower demand for consumer products. In the announcement, Defendant Reichental stated that the Company was still on track to double its revenue over the next few years and grow the Company's profitability over the long term.

101. On February 28, 2014, Defendants caused the Company to issue a press release titled "3D Systems Reports Q4 and Full Year 2013 Results." The press release once again emphasized "another record quarter" and stated, in relevant part, as follows:

> ROCK HILL, South Carolina – February 28, 2014 - 3D Systems Corporation (NYSE: DDD) announced today that its fourth quarter revenue grew 52% from the prior year to a record $154.8 million on 34% overall organic growth, resulting in GAAP earnings of $0.11 per share and non-GAAP earnings of $0.19 per share for the fourth quarter.
>
> For the fourth quarter 2013, gross profit increased 53% and gross profit margin remained flat at 51.7% compared to the 2012 fourth quarter, and contributed to GAAP net income of $11.2 million, and non-GAAP net income of $19.7 million.
>
> For the full year 2013, revenue increased 45% to a record $513.4 million on 80% printers and other products growth and 29% organic growth, resulting in GAAP earnings of $0.45 per share and non-GAAP earnings of $0.85 per share for the year. Gross profit increased 48% and gross profit margin expanded 90 basis points to 52.1%.
>
> Fourth Quarter 2013 Revenue Highlights (compared to 2012 quarter):
> - 3-D printers and other products revenue increased 76% to $73.9 million.
> - Print materials revenue grew 39% to $37.2 million.
> - Services revenue rose 33% to $43.7 million.
> - Healthcare revenue increased 67% to $21.8 million.
> - Consumer solutions expanded 162% to $8.9 million.
>
> Full Year 2013 Revenue Highlights (compared to 2012):
> - 3-D printers and other products revenue increased 80% to $227.6 million.
> - Print materials revenue grew 24% to $128.4 million.
> - Services revenue rose 27% to $157.4 million.
> - Healthcare revenue increased 45% to $71.7 million.
> - Consumer solutions expanded 206% to $34.8 million.

102. In the press release, Defendant Reichental noted that the Company had achieved another record quarter due to high printer demand, increased materials' growth gate, and total

unit sales that were more than triple that of the previous year.  The press release again stated that the Company expected to double revenue over the next two years.

103.     Defendants caused the Company to release further glowing reports concerning the Company's business and prospects moving forward.  For instance, on February 28, 2014, in the Company's fourth quarter for 2013 earnings conference call with investors and analysts, Defendant Reichental stated: "we believe that direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years and our plan is to as much as quadruple sales over the next 12 months to 18 months."  All of Defendants were well aware at the time of this statement that there was no reasonable basis upon which to make such a projection, that the Company's Phenix division was unable to meet existing orders, and that the Company was in no position to locate and retain the qualified French personnel needed and to purchase the necessary machinery required to double, let alone "quadruple," manufacturing of industrial 3-D metal printers at the Company's Phenix division.

104.     During the February 28, 2014 conference call, Defendant Reichental stated, in pertinent part:

> We expect the recent acquisition of Village Plastics to bolster our consumer material development and margins and the alliance and partnerships with domain experts in toys and food to position us for leadership in those categories. Furthermore, we expect the acquisitions of Gentle Giant and Digital PlaySpace to enhance our brand publishing capabilities and the attractiveness of our consumer and retail platform.
>
> *        *        *
>
> Based on our current line-up of direct metal printers, customer demand and plant capacity expansions, we expect our direct metal business to generate between $25 million and $50 million of revenue in 2014. And for metals, this represents the beginning.
>
> Some may view this as a small niche. However, we believe that direct metal printing represents one of the most important and exciting advanced

manufacturing growth opportunities over the next few years and our plan is to as much as quadruple sales over the next 12 months to 18 months. We believe that plan is fully consistent with the growing demand of our expanding direct metal line-up.

105.    Defendant Gregoire also spoke about the Company's direct metal printers and the challenge of expanding manufacturing capacity to meet customer demand.  He stated that "[w]e are in the process of tripling capacity over—from that period over this next year.  And if metals continue to do what we would expect and everything, you can expect additional expansion, and that's a good thing."  Defendant Gregoire made these statements knowing full well that the Company was incapable of meeting the goal of tripling manufacturing capacity.

106.    On the February 28, 2014 conference call, Defendants were questioned about a rise in operating expenses announced by the Company.  Defendant Reichental downplayed the issue by stating "we fully expect operating leverage to return in 2015.  So we—based on our planned product lineups, technology, and execution, **we don't see any obstacles to success**, unless the world collapses somehow" (emphasis added).  Defendant Reichental made this statement despite the capacity issues facing the Company and knowing that there were indeed obstacles to the Company's success.

107.    On this news, the Company's stock increased approximately 6.8%, to close at $79.77 per share on February 28, 2014, the same day that Defendant Reichental falsely pumped the Company's prospects in the investor and analyst conference call.

108.    As more fully detailed below (in the section titled "Illegal Trades Made Throughout the Relevant Period"), in the days following the artificial spike in the Company's stock price resulting from Defendant Reichental's false and misleading statements during the February 28, 2014 conference call, Defendants Reichental and Loewenbaum sold shares of 3D common stock at artificially inflated prices and reaped over $9 million in proceeds.

109.    In the Company's 2014 proxy statement filed on Form DEF14A with the SEC on April 1, 2014 (the "2014 Proxy"), the Company falsely represented that the reason for the Company's growth in sales—which was attributable to its acquisition of other companies rather than any organic growth in sales of particular products—was due to "growth in demand for 3-D printers" and products, as follows:

*Financial Review*

Our revenue increased by 45.2% in 2013 to $513.4 million from $353.6 million in 2012. This reflected growth in demand for 3-D printers and increased demand in several key industries we serve, increased print material sales from a growing installed base, increased software revenue and higher service revenue from Quickparts.

Our gross profit increased by 47.7% to $267.6 million from $181.2 million in 2012 primarily from an increase in sales and our increased gross profit margin printers and other products and materials. Our gross profit margin percentage improved to 52.1% in 2013 from 51.2% in 2012. Gross profit margin benefited from improvements in our cost structure, higher print materials gross profit margin, and the addition of software products, partially offset by increased sales of lower margin on-demand custom parts services and an adverse revenue mix.

110.    As part of the Company's deceptive presentation of its financial condition, the sole item in connection with which the Company made any mention of its acquisition was the increase in operating expenses:

Our total operating expenses increased by $66.1 million to $186.7 million in 2013 from $120.6 million in 2012, reflecting higher SG&A expense, primarily due to increased sales and marketing expenses and higher staffing due to our expanding portfolio. The increase also reflected a $20.3 million increase in research and development expenses related to our portfolio expansion and diversification and concentrated and accelerated new products developments.

Our operating income improved by $20.3 million to $80.9 million from $60.6 million in 2012. This was primarily due to higher revenue and the increase in our gross profit noted above, partially offset by higher operating expenses. Our net income in 2013 increased to $44.1 million from $38.9 million in 2012.

111.    On April 29, 2014, the Company issued a press release outlining 3D's first quarter

2014 financials.  Again, the Company touted record revenue that was falsely attributed to increased demand for its products and services.  The Company also falsely assured investors that it was "increasing its manufacturing capacity to accommodate rising demand."

112.    Also on April 29, 2014, Defendant Reichental continued to falsely promote the Company's prospects in the Company's first quarter 2014 earnings conference call with analysts and investors by representing that the Company was expanding its direct metal 3-D printer sales capacity through its acquisitions.  Defendant Reichental again falsely represented that the Company would be able to accommodate the increased demand since the Company would "quadruple direct metal printer sales over the next 12 months to 18 months."

113.    During the April 29, 2014 conference call, Defendant Reichental stated, in pertinent part:

> Growing direct metal 3-D printer sales again outstripped our manufacturing capacity during the first quarter, even as we continued to add capacity, and contributed to our increased total printer's backlog.
>
> *      *      *
>
> In the first quarter, 3-D printers and other products revenue grew 53% to $60.8 million and made up 41% of total revenue. 3-D printers alone contributed $50.7 million, growing some 60% over the 2013 quarter.  All our printer categories experienced strong demand, and our effective sales and marketing direct metal printers campaign continued to produce greater demand, once again outpacing our manufacturing capacity, even as we continue to add capacity.
>
> *      *      *
>
> We continue to expand manufacturing capacity across our portfolio, including accelerated expansion of our direct metals manufacturing, as demand from industrial companies continues to outpace our capacity.  Healthcare remains one of our fastest growing verticals, as we continually focus on extending our applications and reach.  In line with that, in April, we acquired Medical Modeling, a leading provider of 3-D printing-enabled patient-specific medical devices and personalized surgical treatments, including proprietary virtual surgical planning and clinical transfer tools.

33

\*     \*     \*

We entered the second quarter of 2014 with positive sales momentum and increased backlog, driven by continued strong demand for advanced manufacturing activities across all of our categories. As our new, faster, and more advanced 3-D printers and materials gain traction, we expect accelerated revenue growth for the second half of this year. We continue to view direct metal printing as a very important and exciting manufacturing growth opportunity and plan to quadruple direct metal printer sales over the next 12 months to 18 months.

114.    Defendant Gregoire again echoed Defendant Reichental's statements, noting that "[a]ll our printer categories experienced strong demand and our effective sales and marketing Direct Metal printers campaign continue to produce greater demand, once again outpacing our manufacturing capacity even as we continue to add capacity." Defendant Gregoire further falsely indicated that any capacity issue was merely a short-term problem and would be rectified as the Company's manufacturing capacity increased.

115.    In reaction to these false statements made by the Defendants Reichental and Gregoire, analysts held firmly on their buy ratings and overall positive outlook for the Company.

116.    On the heels of the April 29, 2014 false statements promoting the Company's stock price, Defendants Gregoire and Hull sold shares of their 3D common stock at artificially inflated prices and reaped proceeds of approximately $2 million between May 7, 2014, and May 19, 2014.

117.    In reality, the Company was unable to expand its sales or manufacturing capacity by anything approaching the type of expansion that Defendants had been projecting for many months as detailed above. The Company's resources were spread too thin due to its aggressive acquisition strategy, making it impossible to meet the lofty expectations set by Defendants.

118.    As more fully detailed below, Defendants took advantage of the market's eagerness in the wake of the unrealistic projections they issued by selling more of their 3D stock

at artificially inflated prices.

## III.  THE TRUTH EMERGES AND DEFENDANTS FALSELY MINIMIZE AND CONCEAL THE FACTS

119.    On July 31, 2014, after several quarters of Defendants' pumping 3D stock and its prospects, the truth finally began to emerge about the true condition of the Company when the Defendants caused 3D to issue a press release titled "3D Systems Reports Second Quarter and Six Months 2014 Financial Results." The press release stated, in relevant part:

> ROCK HILL, South Carolina – July 31, 2014 - 3D Systems Corporation (NYSE: DDD) announced today that its second quarter revenue grew $30.7 million, or 25%, from the prior year to $151.5 million on strong demand for its design and manufacturing printers, materials and services, resulting in second quarter GAAP earnings of $0.02 per share and non-GAAP earnings of $0.16 per share.
>
> Organic growth amounted to 10% as additional orders-in-hand, including $23.1 million of printer orders, a 29% sequential increase over the March backlog for printers, expanded the company's second quarter total backlog to a record $31.9 million.
>
> Gross profit margin shouldered the transitional effects of concentrated new product launches as well as the absorption of legacy products obsolescence and manufacturing expansion costs. Together, these factors and changed mix compressed gross profit margin some 400 basis points from the prior year's quarter to 47.8%.
>
> For the six months 2014, revenue grew $76.4 million, or 34%, with growth distributed broadly across all categories, to $299.3 million, resulting in GAAP earnings per share of $0.07 per share and non-GAAP earnings per share of $0.30 per share.

120.    The $150 million in actual revenue was far short of the predicted $162.3 million expected by Wall Street based upon the above-detailed statements and projections made by Defendants. Gross margins were also lower than the expected forecast of 51%, coming in at only 47.8%. Likewise, the Company's reported organic growth sunk to 10% from previous claims of 30% organic growth in earlier quarters.

121.    On this information, the Company's stock declined $5.94 per share, or

approximately 11%, to close at $50.13 per share on July 31, 2014, and continued to decline thereafter. This decrease erased nearly $653 million in market capitalization and allowed Defendants to reap millions of dollars by selling earlier in the Relevant Period, when the Company's stock price was artificially inflated from the false and misleading statements in the Company's financial reports.

122.    Despite the emergence of true prospects of the Company, Defendant Reichental, in the July 31, 2014 press release, stated:

> While transitional forces temporarily pressured our gross profit margin, a detailed examination of the specific drivers, confirms that the fundamentals of our business are intact and our gross profit margins are poised to rebound and resume their expansion trajectory . . . . Consistent with our historical performance, we expect to generate a higher portion of our revenue during the second half on rebounding margins. Record bookings for our design and manufacturing printers together with rising orders for our consumer products provides us with confidence in our ability to achieve our 2014 guidance.

123.    As the news of 3D's true prospects began to emerge, *Business Insider* released a July 31, 2014 article titled "3D Systems Shares are Cratering," in which truth about the Company and the previous glowing reviews by Defendants emerged to the investing public. The *Business Insider* article stated, in relevant part:

### 3D Systems Shares Are Cratering

Shares in 3D Systems were down more than 12% in pre-market trading Thursday after the firm reported earnings and revenue that fell short of expectations.

Q2 EPS came in at $0.16 a share versus forecasts for $0.18. Revenue hit $151.5 million against $162.3 million expected.

Inventory climbed to $90 million versus $86 million forecast, and gross margin came in at 47.8% versus 51% forecast.

CEO Avi Reichental said spending on new product launches held profits back this quarter but that underlying trends remained sound . . . .

It's been a shaky year for 3D Systems and its chief competitor, Stratasys. We've

36

previously discussed why we think the 3-D printing industry faces a hype problem. Here's a chart showing the two firms' returns YTD: . . . .

124. Also on July 31, 2014, Defendants Reichental and Gregoire attended a conference call on behalf of the Company to discuss the second quarter financials. The two stated that the Company was not able to meet the high demand for its direct metal printers and consumer products due to the ongoing manufacturing capacity issues. These revelations were in conflict with previous statements made by Defendants in which they touted the Company's increasing manufacturing capacity, promising to quadruple manufacturing capacity in coming months.

125. In particular, on July 31, 2014, Defendant Gregoire stated that the Company's Phenix manufacturing facility in France, the Company's primary source for manufacturing industrial 3-D metal printers, was maxed out and that the Company would need to add a new U.S. facility to meet customer demand. Defendants attempted to minimize the damage by shifting from promising to quadruple Phenix's manufacturing capacity—as they had been doing for months—to reassuring analysts that the Company would have "ample manufacturing capacity" from its new manufacturing facility to fulfill increasing customer demand for direct metal printers as early as the first quarter of 2015.

126. When questioned about the Company's financials, Defendant Reichental explained that the Company had confidence that declining margins would "rebound and resume their expansion trajectory," noting that this opinion was based upon a "careful analysis" he had conducted himself on the matter.

127. However, after the truth was revealed on July 31, 2014, the Company continued to lose market capitalization and its stock price steadily declined, though—in part due to Defendants' regular flow of falsely reassuring representations—it was still trading at artificially inflated prices and continued to do so until Defendants caused 3D to release preliminary results

for the third quarter of 2014.

128.    In the days following the July 31, 2014 announcement, numerous analysts, including Citigroup, Piper Jaffray & Co., and RBC, downgraded their ratings or lowered their price targets for the Company's stock.  The Company's stock closed at $47.93 per share on August 1, 2014, down from its $56.07 closing mark on July 30, 2014.

129.    The disclosures made in the July 31, 2014 announcement were in direct conflict with the false and misleading statements made by Defendants, who had been emphasizing the Company's positive financial position and outlook.

130.    On August 7, 2014, at the Needham Advanced Industrial Technologies Conference, Defendant Gregoire continued to downplay the financial and manufacturing capacity issue that the Company was facing.  He noted that the Company would not be capacity constrained within the next year and that the Company continued to add manufacturing capacity to meet strong customer demand.  Defendant Gregoire stated that capacity would reach about $100 million a year by January 2015.

131.    Further, on August 7, 2014 at the Needham Advanced Industrial Technologies Conference, when questioned about challenges generated by the Company's slew of acquisitions, Defendant Gregoire stated that integration was something that happens quickly and easily, and that the Company had a roadmap in order to get there quickly.  In fact, the Company was struggling to integrate with its acquisitions and had been spread too thin by its rapid acquisition strategy.

132.    As more fully detailed herein, following Defendant Gregoire's false and misleading statements made on July 31, 2014, and August 7, 2014, that artificially inflated the Company's stock price, Defendants Reichental, Hull, and Gregoire sold significant amounts of

their 3D holdings, reaping over $6 million in proceeds combined between August 18, 2014, and September 15, 2014.

133.    On October 22, 2014, the Company issued a press release titled "3D Systems Announces Preliminary Third Quarter 2014 Results," which announced that actual third quarter results for 2014 would be lower than original expectations.   In particular, the Company announced that "[s]trengthening sales of the company's design, manufacturing and healthcare products and services were not enough to overcome the revenue shortfall from the continued manufacturing capacity constraints for its direct metals printers and delayed availability of its newest consumer products."

134.    The Company announced that its third quarter revenue was expected to be significantly below the expectations of $186 million; instead, the Company reported third quarter revenue to be only between $164 million and $169 million.   Furthermore, the Company lowered its outlook for its full-year revenue to come in between only $650 million and $690 million, as opposed to $700 million to $740 million.

135.    The Company also held a conference call on October 22, 2014 to discuss these preliminary results.   While expressing disappointment at the preliminary outlook for the quarter, Defendant Reichental stated that "we have very high expectations from our direct metal printers and our consumer printers . . . . and our sense is that while the opportunity shifted forward a few periods the magnitude that it represents in terms of revenue generation potential, both in metals and in consumer product, remains relevant and available, the period shifted forward a couple of periods."   In this fashion Defendant Reichental ignored and concealed the long-term limitations of the Company's industrial 3-D metal printer manufacturing capacity.

136.    During the October 22, 2014 conference call, Defendant Reichental also ignored

and concealed the product development problems plaguing the Company's consumer line and falsely attributed the Company's inability to meet consumer printer demand to a "disciplined decision not to ship consumer product before we determined that they fully met our user experience criteria."

137.    Defendants falsely denied and concealed the serious consumer printer quality problems the Company was experiencing.   On the conference call Defendant Reichental represented that the Company's new consumer printers "have gotten incredibly positive reviews from a very discerning group of customers that tend to think that we have something really, really exciting here.  So we expect that demand to continue to grow and to influence our results in the future . . . . we expect, not just in the fourth quarter, but going into next year we expect to realize increasingly growing revenue from our Consumer Products."

138.    Defendants downplayed the severity of the Company's lack of sufficient industrial 3-D metal printer manufacturing capacity by representing that the Company had resolved product availability issues.  On the conference call, Defendant Reichental stated: "Now that we remediated this we believe that we are positioning ourselves extremely well for 2015," and "[n]ow that we have effectively closed this product availability gap we expect our revenue growth rates to increase."  This statement was made in spite of knowledge that the Company's inability to meet demand for its direct metal printers was structural and long-term as detailed above.

139.    Despite the above-described false and misleading statements designed to minimize the effects of the Company's lower than expected third quarter revenue and downward revision of its full-year 2014 guidance, 3D's stock continued to fall, dropping over 15% to close at $36.67 per share on October 22, 2014, a decrease of $6.71 per share from the prior trading

day.   This   significant   drop   caused   the   Company   to   lose   $737.5   million   in   market capitalization.

140.    Based upon this information, analysts such as Deutsche Bank and Needham & Company LLC downgraded their ratings for the Company's stock.

141.    On November 10, 2014, the Company issued a press release detailing the third quarter results.  The statements contained therein echoed those made in the preliminary financial release on October 22, 2014.  In particular, the press release stated that "[s]trengthening demand for the company's leading design and manufacturing products was not enough to overcome the revenue shortfall that resulted from the company's continued manufacturing constraints for direct metal printers and the delayed availability of its newest consumer products."

142.    On that same day, the Company held a conference call to discuss these financial results.  Defendant Reichental once again falsely represented that the Company would be in a position to meet demand going forward:

> We're very disappointed that we were not able to monetize all the available demand for our metal printers, and capture a greater portion of the consumer printers opportunity during the quarter.  Having said that, during the quarter we took decisive measures to remediate these remaining performance gaps. Specifically, we brought on line a second manufacturing line that now allows us to fulfill the increasing metal printers demand, and we commenced shipment of our latest consumer printers, and believe that the immediate positive user response that these products already received validates our decision to wait until there products were ready.

> \*       \*       \*

> Now that we are ramping up production in a second direct metals facility, we expect to be able to meet this rising demand during the fourth quarter and beyond.

143.    Additionally, Defendant Reichental falsely stated that the Company's consolidation and integration of its new acquisitions had been a success:

> The nature of consolidation and integration is such that, given that we like to do it

41

in a way that's accretive and profitable, we are shedding unprofitable growth and replacing it with profitable growth. When you do it, and in every period you continue to add acquisitions, the underlining net progress is not as clear as it would be had we ceased to make those acquisitions. And I think what you should really take note of is that, even in a period that we had a high concentration of acquisitions, we still managed to expand our gross profit margin, which for that particular business right now is our primary objective—to fully integrate, to put it all on the same platform, and to continue to expand margin. ***We have done it really well, and we expect that, that will bode well for us in the future***.

(emphasis added.)

144.    As more fully detailed below, following the statements made by Defendant Reichental on November 10, 2014, artificially inflating the Company's stock price, Defendants Hull and Gregoire sold more shares of the Company's stock, reaping approximately $2 million in proceeds combined.

145.    On April 24, 2015, the problems continued, with the Company revealing preliminary financial results for the first quarter of 2015. The Company disclosed additional problems with its direct metal printers, noting "certain metal and nylon applications and performance issues delayed the company's ability to sell additional printers during the quarter."

146.    The Company also held a conference call with analysts to discuss the preliminary results disclosed in the press release. Defendant Reichental noted that the Company did not expect any organic growth in the quarter. Specifically, Defendant Reichental stated:

I think that it should be clear that because our preliminary results clearly reflect revenue shortfall from adverse currency and lower than expected printers and materials revenue, we don't expect to report organic growth for the quarter. That doesn't mean we have give up on the rest of the year. It's just that the combination of where the shortfall was and the double impact of currency on top of it is not likely to result in organic growth for the first quarter.

147.    Defendant Hull also spoke to the factors that caused the decline in financial results and stated that the shortcomings were due to "certain metal and nylon applications and performance issues that delayed our ability to sell additional printers in the quarter." Further,

42

when questioned about what changes should be implemented within the Company to address these issues, Defendant Hull noted that the Company needed to control operating expenses and "tak[e] a hard look at our acquisition activity."

148.    Touching further on the subject of the Company's acquisitions, Defendant Reichental stated that the Company had decided to "substantially dial down acquisitions," so that the Company would be able to focus on its other issues in 2015:

> With that in hand, we're going to substantially dial down acquisitions for the foreseeable future and we're spending all of our attention now on scaling our organization on organizing it for better growth on realizing the synergies from all these acquisitions and leveraging the technologies that we already assembled and parlaying them into long-term substantial profitable growth.

149.    During the call, Defendant Reichental responded to an analyst's question about the continuing trend of quarterly "misses."  Defendant Reichental admitted that the Company had been trying to rectify the problems "on a daily basis for quite some time" and that "we've been doing nothing, but evaluating self-criticizing and agonizing over the business model and the strategy. . . ."

150.    As a result of the April 24, 2015 announcement, the Company's stock price took another hit and analysts such as Piper Jaffray, Canaccord, and UBS downgraded their ratings for 3D stock.  After closing at $30.15 per share the day before the announcement, 3D stock closed at $25.28 per share on April 27, 2015.

151.    On May 6, 2015, the Company released its first quarter 2015 earnings. Defendants finally shifted their focus away from the Company's acquisition strategy and focused on integrating the acquisitions that the Company had made up until that point.  Specifically, Defendant Reichental stated that the Company wanted to "eliminate some of the duplication and redundancy that we acquired from acquisitions."  Further, the Company would shift focus to

improving operational productivity and efficiency, as well as cutting operating expenses.

152.    On August 6, 2015, the Company issued a press release detailing the financial results for the second quarter and first six months ended June 30, 2015.  Commenting on the results, Defendant Reichental noted that the negative results could be attributed to the Company's aggressive acquisition strategy.  Defendants further noted that operating inefficiencies were also to blame.

153.    On October 29, 2015, the Company announced that Defendant Reichental had abruptly stepped down from his position as President and CEO of the Company.  No explanation for this was given, with Defendants merely stating that it was a "mutual agreement" with the Board.  However, S&P Capital IQ analyst Angelo Zino stated that the outgoing CEO was "pushed out" due to investor frustration and the struggles of the Company.

154.    As a result of Defendants' wrongful conduct in concealing material, adverse information from the investing public, Defendants have breached their fiduciary duties to the Company. The price of the Company's shares has continued to fall, and the stock currently trades for around $13 per share.  The Company has suffered a severe loss of reputation and standing in the 3-D printing industry and has failed to recover from the misrepresentations made by the Individual Defendants.

## IV.    THE SECURITIES ACTION SURVIVES THE MOTION TO DISMISS

155.    Defendants' actions detailed herein caused the Company to become the subject of the Securities Action.  The Class Period set forth in the Securities Action is defined as October 29, 2013, through May 5, 2015.  Defendants Reichental, Gregoire, and Hull are also defendants in the Securities Action.

156.    On July 25, 2016, the Court held that the plaintiff in the Securities Action had

made allegations sufficient to state that the defendants engaged in a scheme to defraud the Company's shareholders during the Class Period and denied the defendants' motion to dismiss the Securities Action.

157.    In particular, the Court held, *inter alia*, that "it appears as if Plaintiff has adequately pled that 3D Systems misrepresented the state of their product quality and customer reception to investors," (C/A No. 0:15-cv-02393-MGL, ECF No. 97, at 12), and that "this Court is unconvinced that the entire truth was on the market after the disclosures of July 31, 2014," (*id.* at 24).  The Court added that "[g]iven that it is questionable whether the truth was on the market after July 31, 2014, and that this defense is intensely fact-specific, at this stage of the proceedings, the Court is unprepared to hold that Defendants made its disclosures with such 'intensity and credibility' that it counter-balanced any alleged misleading information given by the Company earlier." (*Id.*)

158.    The fact that the Court concluded as such is significant due to the heightened pleading standards imposed upon plaintiffs in the Securities Action by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  The Court noted that the plaintiffs had presented sufficient allegations to support a claim of scienter and stated:

> In addition to the inferences drawn from the Individual Defendants' positions, the allegedly misrepresented issues all related to core operations, which by nature can contribute to a strong inference of scienter.  The amended complaint alleges misrepresentations about 3D System's acquisition strategy, core product lines, shipping, inventory, and manufacturing capacity.  Bolstering the inference that Individual Defendants knew about these core operations are the allegations that they repeatedly spoke on these issues at conferences, on conference calls, and in press releases.  At least once during every quarter, Defendants Reichental, Gregoire, or Hull purportedly answered questions about these core operations to the media or analysts. . . .  As already observed, each of the Individual Defendants made repeated statements about core operations of 3D Systems, such as the acquisition strategy, inventory control, and product quality.

(C/A No. 0:15-cv-02393-MGL, ECF No. 97, at 19 (citations omitted).)

159.    The Court also noted that the complaint in the Securities Action contained sufficient allegations to support a claim of insider trading, stating that the numbers of shares sold by Defendants Reichental and Gregoire were "consistent with an inference that the insiders who traded during the Class Period had a motive to commit fraud," (*id.* at 21), and were timed "to take advantage of particular favorable disclosures, which can boost an inference of insider trading," (*id.* at 22).

## V.    ILLEGAL TRADES MADE THROUGHOUT THE RELEVANT PERIOD

160.    Throughout the Relevant Period, as Defendants promoted the Company's stock through false and misleading statements, certain of Defendants capitalized on the artificially inflated stock price by selling significant portions of their holdings of 3D common stock.

161.    Between November 2013 and November 2014, Defendants Reichental, Hull, Loewenbaum, Moore, and Gregoire all sold shares of their 3D common stock at artificially inflated prices ranging from $35.33 to $80.91 per share.   Collectively, Defendants sold over 500,000 shares of the Company's common stock and reaped over $31 million in proceeds.   In particular, Defendant Reichental sold 144,000 shares of 3D at prices between $40.00 and $80.91 per share, reaping total proceeds of $8,814,447.   Defendant Hull sold 55,000 shares of 3D at prices between $36.05 and $56.54 per share for total proceeds of $2,591,825.   Defendant Gregoire sold 162,500 shares of 3D at prices between $35.33 and $80.09 per share for total proceeds of $8,928,850.   Defendant Loewenbaum sold 151,479 shares of 3D at prices between $40.00 and $76.74 per share for total proceeds of $11,244,499.   All of the above-described trades were made following false and misleading statements disseminated by Defendants.

162.    As night follows day, Defendants took advantage of the significant uptick in the Company's stock price following Defendants Reichental and Gregoire's October 29, 2013 false

statements accompanying the Company's release of its third quarter earnings, including Defendant Reichental's false representation that the Company was tripling its industrial 3-D metal printer manufacturing capacity over the next 12 months, and Defendant Reichental's concealing of inventory and quality control problems plaguing its consumer 3-D printer operations.  In the two weeks following the October 29, 2013 false statements that artificially inflated the Company's stock price, the Company's CEO, CFO, Chairman of the Board, and Chairman of the Audit Committee all sold significant amounts of their 3D holdings.

163.    Immediately following the Company's false representations on October 29, 2013, that it would triple its industrial 3-D metal printer manufacturing capacity over 12 months, Defendant Reichental sold 25,000 shares of 3D stock on October 29, 2013, reaping over $2 million in proceeds.  On November 5, 2013, Defendant Moore sold 15,000 shares of 3D for $68.44 per share, for total proceeds of $1,026,600, On November 11, 2013, Defendant Loewenbaum sold 80,000 shares of 3D for prices between $76.25 and $76.74 per share, for total proceeds of over $6.1 million.  On November 15, 2013, Defendant Gregoire sold 46,000 shares of 3D at prices between $79.92 and $80.81 per share, for total proceeds of approximately $3.6 million.

164.    Following the Company's announcement on February 28, 2014, of its financial results for the fourth quarter of 2014 and the accompanying false representations by Defendants falsely touting the Company's increase in manufacturing capacity, between March 5, 2014, and March 6, 2014, Defendant Loewenbaum sold 71,479 shares of 3D, reaping over $5 million in proceeds.  On March 14, 2014, Defendant Reichental sold 66,700 shares of 3D, reaping over $4 million in proceeds.

165.    Immediately following the April 29, 2014 false statements touting the Company's

acquisitions and positive growth, Defendant Gregoire sold 22,500 shares of 3D on May 7, 2014, reaping over $1 million in proceeds, and Defendant Hull sold 22,500 shares of 3D between May 19, 2014, and July 21, 2014, reaping over $1 million in proceeds.

166.    Following the false and misleading statement on July 31, 2014, regarding the Company's record bookings and rising sales orders, and the August 7, 2014 announcements by the Company falsely touting its integration of acquisitions and increase in manufacturing capacity and representing that the Company would not be capacity constrained within the next year, on August 27, 2014, Defendant Gregoire sold 50,000 shares of 3D, reaping over $2.6 million in proceeds.  On August 29, 2014, Defendant Reichental sold 52,300 shares of 3D, reaping approximately $3 million in proceeds.  Between August 18, 2014, and October 20, 2014, Defendant Hull sold 22,500 shares of 3D, reaping over $1 million in proceeds.

167.    Following a November 10, 2014 announcement by the Company falsely stating that it was ramping up manufacturing production to meet high sales demand, on November 19, 2014, Defendant Hull sold 10,000 shares of 3D, reaping $360,500 in proceeds.  On that same date, Defendant Gregoire sold 45,000 shares of 3D, reaping over $1.5 million in proceeds.

168.    The sales made by Defendants were made while in possession of material, adverse, non-public Company information and were suspicious in timing and amount.  The sales were timed in such a way in order to coincide with the release of false and misleading positive news concerning the Company's financial prospects detailed above that artificially inflated the Company's stock price.  Because of their role as directors and/or officers of the Company, Defendants Reichental, Hull, Loewenbaum, Moore, and Gregoire either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the Company's business, including that statements about

the Company's manufacturing capacity, growth projections, and financial position were false and misleading and caused the price of its stock to become artificially inflated, at the same time Defendants capitalized by cashing in their shares in violation of the Company's Insider Policy.

169.    The Company has adopted an Insider Trading Compliance Policy (the "Insider Trading Policy")[1] providing that all persons covered under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

**DEFENDANTS' DUTIES**

170.    As officers and directors of the Company, Defendants had the ability to control the business and corporate affairs of 3D and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.  Defendants were and are required to use their utmost ability to control and manage 3D to operate in a legal and honest fashion. Defendants were and are required to act in furtherance of the best interests of 3D and its shareholders to benefit all shareholders.

171.    Each director and officer of the Company owes to 3D and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

172.    In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

---

1.    *See* 3D Systems Corporation Insider Trading Compliance Policy (amended as effective Jan. 1, 2015), *available at* http://www.3dsystems.com/files/downloads/3d-systems-insider-trading-policy-effective-jan-1-2015.pdf.

173. Defendants, because of their positions of control and authority as directors and/or officers of 3D, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by 3D.

174. Because of their advisory, executive, managerial, and directorial positions with 3D, each of Defendants had a duty to know of and understand the basic business of the Company such that they knew of the true business and prospects of the Company and related that information correctly and accurately to the Company's investors and potential investing public.

175. Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of 3D were required to, among other things:

    a. Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

    b. Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c. Properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

    d. Remain informed as to how 3D conducted its operations, and, upon receipt of

notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

e. Ensure that 3D was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

176.    In addition to these duties, the Company has adopted the Insider Trading Policy with the purpose "to provide guidance to anyone who works for 3D Systems Corporation . . . with respect to trading in the Company's securities as well as in securities of publicly traded companies in which [3D] has any business relationship."  The Insider Trading Policy "is designed to promote compliance with applicable securities laws by the Company and all of its directors, officers and employees" and has, as general rules:

(1)    No trading while in possession of inside information;

(2)    No tipping or sharing non-public information with others or to recommend to anyone the purchase or sale of any securities;

(3)    Pre-clearance procedures that require all personnel to whom the Insider Policy applies to pre-clear each transaction involving the Company's securities; and

(4)    "Blackout" periods that require designated persons subject to the pre-clearance procedures to refrain from trading during certain periods following the announcement of the Company's quarterly financial results.

177.    Furthermore, the Board adopted an Amended Audit Committee Charter, effective as of May 15, 2012 (the "Audit Committee Charter"),[2] with the purpose of assisting the Board in its oversight duties, accounting and reporting practices, and the adequacy of the Company's

---

2.    *Available at* http://www.3dsystems.com/files/downloads/3DSystems-Audit-Committee-Charter-05-15-2012.pdf.

financial and accounting policies, among other duties.  The Audit Committee Charter provides additional duties with respect to the Audit Committee members, consisting of Defendants Curran, Moore, and Van Riper (collectively, the "Audit Committee Defendants").   The additional responsibilities include, *inter alia*:

    a.  Review the periodic reports of the Company with management of the Company, the internal auditor and the independent auditor prior to filing of the reports with the Securities and Exchange Commission;

    b.  Review with management, the independent auditor and the internal auditor the Company's and the Independent Auditor's assessment of the effectiveness of its internal controls;

    c.  Review with management of the Company and the independent auditor at the completion of the annual audit:

        i.  the Company's annual financial statements and related footnotes;

        ii.  the independent auditor's audit of the financial statements and its report thereon;

        iii.  the independent auditor's report on internal controls;

        iv.  any significant changes required in the independent auditor's audit plan;

        v.  any serious difficulties or disputes with management of the Company encountered during the course of the audit, including any restrictions on the scope of their work or access to required information;

        vi.  significant findings during the year and management's responses thereto; and

vii. other matters related to the conduct of the audit which are to be communicated to the Committee under generally accepted auditing standards;

d. Review with management of the Company and the independent auditor at least periodically the Company's critical accounting policies;

e. Review disclosure in the Company's financial statements and periodic reports of transactions between the Company and officers and directors, or affiliates of officers or directors, or transactions that are not a normal part of the Company's business; and

f. Review with management of the Company at least periodically the Company's principal financial policies.

## **BREACHES OF DUTIES**

178.    Each Defendant, by virtue of his or her position as a director and/or officer of the Company, owed to 3D and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of 3D, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of 3D, the absence of good faith on their part, and a reckless disregard for their duties to 3D and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to 3D.

179.    Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's

financial and business prospects were truthful and accurate when made.

180.    Due to Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Action that alleges violations of the federal securities laws and will cause the Company to expend significant sums of money for the defense and potential settlement of the lawsuit.

181.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

182.    During all times relevant hereto, Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

183.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

184.    Defendants knowingly permitted and participated in the release of improper statements.  Because the actions described herein occurred under the authority of the Board, each of Defendants was a direct, necessary, and substantial participant in the conduct complained of herein.

185.    Each of Defendants aided and abetted and rendered substantial assistance in the

wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO THE COMPANY

186.  The Company has been, and will continue to be, severely damaged and injured by Defendants' misconduct.  Such harm includes but is not limited to:

    a.  Costs incurred in compensation and benefits paid to Defendants that breached their duties to the Company;

    b.  Substantial loss of market capital;

    c.  Costs already incurred defending against the pending Securities Action, and potential liability therefrom; and

    d.  The Company's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.

187.  The actions complained of herein have irreparably damaged 3D's corporate image and goodwill.  For at least the foreseeable future, 3D will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that 3D's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

188.  Plaintiff brings this action derivatively in the right and for the benefit of Nominal Defendant 3D to redress injuries suffered, and to be suffered, by 3D as a direct result of Defendants' breaches of fiduciary duties and unjust enrichment.  3D is named as a nominal

defendant solely in a derivative capacity.

189.    Plaintiff will adequately and fairly represent the interests of 3D in enforcing and prosecuting its rights and was a shareholder of 3D common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

190.    At the time this action was commenced, the Board of 3D consisted of the following ten directors: Defendants Reichental, Hull, Loewenbaum, Van Riper, Moore, Kever, Welke, Diamandis, Humes, and Curran.

191.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act for reasons detailed below.

## I.    THE COMPANY ADMITS THAT DEFENDANTS REICHENTAL AND HULL ARE NOT INDEPENDENT

192.    Defendant Reichental has been the President and CEO and a director of 3D since September 2003.  For the fiscal years 2014 and 2013, Defendant Reichental received $6,640,675 and $10,898,483 in total compensation,[3] respectively.  Defendant Reichental derived significant income from, and his primary source of income was, his employment as President, CEO, and director of 3D, and as such, his reputation is inextricably bound to his role at 3D.  As the Company admits in the 2015 Proxy filed with the SEC on April 1, 2015, Defendant Reichental is not independent.

193.    Defendant Hull is the founder of 3D and has been a member of the Board since 1993.  Defendant Hull has also been the Executive Vice President since 2000 and the Chief Technology Officer of the Company since 1997.  Within the last five years, Defendant Hull has worked in a variety of executive officer positions with 3D, including as CEO, Vice Chairman of

---

3.    Total compensation includes Defendant Reichental's salary, as well as any bonus, stock awards, non-equity incentive plan compensation, and all other compensation.

the Board, President, and Chief Operating Officer.  For the fiscal year 2014, Defendant Hull received total compensation[4] of $2,291,827.  As the Company admits in the 2015 Proxy, Defendant Hull is not independent and therefore cannot independently consider any demand to sue himself for breaching his fiduciary duties to 3D, as that would expose him to liability and threaten his livelihood.

## II. DEMAND IS FUTILE AS TO ALL DEFENDANTS BECAUSE THE BOARD FAILED TO CLAW BACK DEFENDANT REICHENTAL'S ILL-GOTTEN GAINS FROM ISSUING FALSE AND MISLEADING STATEMENTS AND THEIR RELATED INSIDER TRADING

194.    On October 29, 2015, the Company announced that Defendant Reichental had resigned his positions as the Company's President and CEO, as well as a director of the Company, by "mutual agreement" with the Board.

195.    Upon information and belief, in the face of the blatant and obvious fact that Defendant Reichental issued false and misleading statements for two years to the investing public in order to artificially inflate the Company's stock price, and benefited thereby reaping millions of dollars in ill-gotten gains through illegal insider trading, the Board terminated Defendant Reichental for cause, although the termination was packaged and presented as a departure "by mutual agreement."

196.    Although Defendants understood that Defendant Reichental had personally defrauded the Company of millions of dollars by virtue of his false statements and insider trading, in addition to costing the Company hundreds of millions of dollars in lost equity and damages from legal actions resulting from his false and misleading statements, Defendants made no effort to claw back compensation in any form that Defendant Reichental received during the

---

4.    Total compensation includes Defendant Hull's salary as an officer and a director of the Company, as well as any bonus, stock awards, non-equity incentive plan compensation, and all other compensation.

Relevant Period in which the Company's stock price was artificially inflated.

197.    In making their decision to permit Defendant Reichental to retain the millions of dollars he received through his illegal conduct, Defendants were led by Defendant Loewenbaum, the Chairman of the Board and Chairperson of the Executive Committee, who had himself made millions in a similar fashion from the illegal artificial inflation of the Company's stock price.

198.    As detailed herein, as Chairman of the Board, the Compensation Committee, and the Executive Committee, Defendant Loewenbaum—the longest serving director, who had an ongoing business relationship with the Company and was a former consultant to the Company before that—was particularly well situated to be fully aware of the Company's true condition and the falseness of the representations being made to the investing public.

199.    By simply letting Defendant Reichental resign, rather than officially terminating him for cause and seeking to claw back Defendant Reichental's ill-gotten gains, Defendants have demonstrated through their actions and inaction, that Defendants are not impartial vis-à-vis a request to file suit against Defendant Reichental for the illegal conduct described herein.

## III. DEMAND IS FUTILE AS TO DEFENDANTS LOEWENBAUM, MOORE, REICHENTAL, AND HULL BECAUSE EACH FACES A SUFFICIENTLY SUBSTANTIAL LIKELIHOOD OF LIABILITY DUE TO THEIR INSIDER TRADING

200.    Demand is excused as to Defendants Loewenbaum, Moore, Reichental, and Hull because those Defendants directly benefited from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with their illicit insider stock sales detailed above and cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

201.    Defendants Loewenbaum, Moore, Reichental, and Hull (the "Insider Trading Defendants"), those at the very top level of the Company—the Chairman of the Board, the

longest serving non-employee director and member of the Audit Committee, the CEO, and the Company's founder (along with CFO Gregoire, who is not a director)—were the primary beneficiaries of the artificially inflated stock prices resulting from the false and misleading statements issued by Defendants during the Relevant Period.  The Insider Trading Defendants, including the longest serving members of the Company's Board, sold significant shares of their 3D stock on material, adverse, and non-public information, reaping over $31 million in profit.

202.    Throughout the Relevant Period, Defendants misled the investing public regarding the true business prospects of the Company.  When the truth finally emerged, the Company's stock plummeted, but only after Defendants had substantially benefited by selling significant portions of their stock at artificially inflated prices.

203.    The Insider Trading Defendants were the longest serving members of the Company's Board, including the Company's CEO, the Company's founder, and the Chairman of the Company's Board and Audit Committee, who were well aware of the Company's obvious manufacturing, inventory, quality control, and other problems.  The Insider Trading Defendants were also well aware that the above-described representations were false and that the significant increases in the Company's stock price that followed the statements were artificial.

204.    It was not coincidental that the best informed and longest serving members of the Board, its chairman and a member of the Audit committee, were the same directors who unloaded significant portions of their Company stock holdings precisely at the time that the stock was artificially inflated.

205.    As described above, the Company has adopted the Insider Trading Policy to "provide guidance to anyone who works for 3D Systems Corporation . . . with respect to trading in the Company's securities."  The Insider Trading Policy provides that all persons covered

under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

206.     As a result, Defendants Loewenbaum and Moore have violated the Company's Insider Trading Policy and face a sufficiently substantial likelihood of liability due to their illicit trades, rendering them interested and unable to consider demand.

## IV.   DEMAND IS FUTILE AS TO DEFENDANTS MOORE, VAN RIPER, AND CURRAN AS MEMBERS OF THE AUDIT COMMITTEE

207.     Demand is futile as to Defendants Moore, Van Riper, and Curran (the "Audit Committee Defendants") as the members of the Audit Committee due to their knowing failure to fulfill the responsibilities defined in the Audit Committee Charter and oversee the Board's actions and reporting practices.

208.     The Audit Committee Charter states that the purpose of the Audit Committee "shall be to assist the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company, the adequacy of the Company's financial and accounting policies."  In particular, the Audit Committee Defendants are responsible and required to "review the periodic reports of the Company . . . prior to filing of the reports with the Securities and Exchange Commission."

209.     As members of the Audit Committee, it is presumed that (and there exists a reasonable inference that) Defendants Moore, Van Riper, and Curran were aware of obvious problems with and limitations of the Company's industrial 3-D metal printer manufacturing capacity.

210.     As members of the Audit Committee, it is presumed that (and there exists a reasonable inference that) Defendants Moore, Van Riper, and Curran were aware of obvious major problems with the quality and product development of the Company's major commercial

60

3-D printers.

211.     As members of the Audit Committee, it is presumed that (and there exists a reasonable inference that) Defendants Moore, Van Riper, and Curran were aware of obvious major problems with the Company's inventory control system.

212.     As members of the Audit Committee, it is presumed that (and there exists a reasonable inference that) Defendants Moore, Van Riper, and Curran were aware of obvious major problems with the Company's efforts to integrate the numerous companies acquired by 3D, which the Company acquired at a frantic pace for a total cost of approximately $700 million.

213.     As members of the Audit Committee, it is presumed that (and there exists a reasonable inference that) Defendants Moore, Van Riper, and Curran were aware of some or all of the above-detailed false and misleading statements in which Defendants concealed, denied, and misrepresented the severity of the four critical problems described in the proceeding four Paragraphs.

214.     The periodic reports concerning the Company's business and prospects moving forward throughout the Relevant Period contained false and misleading information that allowed certain of Defendants to trade on the artificially inflated price of the stock.  In their capacity as members of the Audit Committee, Defendants Moore, Van Riper, and Curran were charged with ensuring that these reports did not contain such information.  By allowing the periodic results of the Company to be filled with misleading information in and from which Defendants were able to personally benefit, the Audit Committee Defendants knowingly allowed the reports to contain false information.

215.     Defendants Moore and Van Riper utilized their additional knowledge—as members of the Audit Committee—of the Company's problems and false and misleading

statements concerning sales, demand, integration of companies, and manufacturing capacity, in order to personally profit by and from the artificially inflated stock prices, as described above.

216.    For all of the reasons detailed above, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot independently consider a demand.

## V.    DEMAND IS FUTILE AS TO DEFENDANT DIAMANDIS BECAUSE OF HIS CONTINUED AND EXTENSIVE BUSINESS RELATIONSHIP WITH 3D AND AS CO-FOUNDER OF PLANETARY RESOURCES

217.    Defendant Diamandis is not an independent director capable of disinterestedly considering a demand upon the Board because he has been the beneficiary of an inexplicable $1.5 million donation by 3D for no valid business purpose, in his capacity as Co-Founder and Co-Chairman of another company, Planetary Resources, Inc. ("Planetary Resources").

218.    Planetary Resources is devoted to space travel for the purpose of landing spacecraft on asteroids, extracting precious minerals such as platinum from asteroids, and returning the extracted minerals to earth.  Because Planetary Resources' goals are far-fetched, highly speculative, and would anyway take decades to realize if at all possible, Planetary Resources is unable to attract conventional investment capital and instead seeks donations based upon philosophical support for the environmental and societal goals of the company.  Planetary Resources has extensively utilized Kickstarter campaigns to raise funds.  In essence, Planetary Resources asks companies and wealthy individuals for donations to its space exploration, mining, and infrastructure technologies.  Planetary Resources lists approximately one dozen "investors" on its website.

219.    On June 26, 2013, 3D and Planetary Resources announced that 3D joined the core group of investors of Planetary Resources' Kickstarter campaign to develop and manufacture

components of its ARKYD Series of Spacecraft. The ARKYD Series, according to Planetary Resources, is supposed to be a space telescope and technology demonstrator that will be employed for prospecting missions looking for likely mining candidates among near-Earth asteroids while also providing commercial Earth imaging and educational space telescope services. Planetary Resources promoted the ARKYD Series as "the most advanced spacecraft per kilogram that exists today."

220.    The Kickstarter campaign to fund the ARKYD Series initially aimed for $1 million in funding. According to 3D's 2013 proxy statement, filed with the SEC on Form DEF14 A on April 1, 2013 (the "2013 Proxy"), in June of 2013, 3D's Board decided to invest/donate $1.5 million Planetary Resources. 3D's investment—or "donation"—to the ARKYD Series put Planetary Resources substantially over its stated goal for the campaign's funding.

221.    Upon information and belief, 3D's $1.5 million investment in Planetary Resources is the largest single investment or donation made in or to Planetary Resources.

222.    3D is not an investment firm and its $1.5 million investment in Planetary Resources was a departure from 3D's business and was not a sound business decision as an investment; nor did Defendants at all explain the background or basis of the $1.5 million "investment" to shareholders. All that was announced to shareholders was a couple sentences listed in the 2013 Proxy, which read:

> In June of 2013, our Board of Directors approved our investment of $1,500,000 in Planetary Resources, Inc. as a collaborative partner in assisting Planetary Resources to develop and manufacture components of its ARKYD Series of spacecraft using its advanced 3-D printing and digital manufacturing solutions. Dr. Peter Diamandis, Co-Founder and Co-Chairman of Planetary Resources, Inc. joined our Board of Directors in July 2013.

223.    Furthermore, 3D's press release announcing the investment in Planetary

Resources added nothing to explain the investment.  The Company's press release titled "3D Systems and Planetary Resources Announce Investment and Collaboration," stated, in pertinent part:

> ROCK HILL, South Carolina, June 26, 2013 – 3D Systems (NYSE:DDD) and Planetary Resources, Inc. announced today that 3D Systems has joined Planetary Resources' core group of investors and will be a collaborative partner in assisting Planetary Resources to develop and manufacture components of its ARKYD Series of spacecraft using its advanced 3-D printing and digital manufacturing solutions.

224.    In the Company's press release announcing the investment, Defendant Reichental further added:

> We are excited to work very closely with Planetary Resources' engineering team to use advanced 3-D printing and manufacturing technologies to increase functionality while decreasing the cost of their ARKYD spacecraft . . . .  In success, we will create the smartphone of spacecraft and transform what has been an old- style, labor-intensive process, into something very scalable and affordable that will democratize access to space, the data collected from space and off-Earth resources for scientists and the public.  We are delighted to join the Planetary Resources team.

225.    Immediately after deciding to transfer $1.5 million to Planetary Resources, in July of 2013, the Board of 3D decided to add an additional directorship to the Board and to appoint Planetary Resources' Co-Founder and Co-Chairman, Defendant Diamandis, to the newly minted directorship, bringing the total number of director positions to ten (10) altogether.  The Company gave Defendant Diamandis oversized compensation in the amount of $138,732 for the half year of 2013 that Defendant Diamandis was on the Board of 3D.

226.    The Board of 3D had never previously added a directorship to the board or appointed an individual to a directorship, rather than nominate and put up an individual for shareholder vote.  Defendants did not at all explain to shareholders the background or basis of the addition of the tenth directorship or appointment of Defendant Diamandis to that directorship.

227.    The Company's press release announcing the addition of Defendant Diamandis stated:

> ROCK HILL, South Carolina July 24, 2013 – 3D Systems (NYSE:DDD) announced today that its Board of Directors has elected Peter H. Diamandis a director of the company.
>
> Dr. Peter Diamandis is the Chairman and CEO of the X PRIZE Foundation, which leads the world in designing and launching large incentive prizes to drive radical breakthroughs for the benefit of humanity.  Diamandis is also the co-Founder & Executive Chairman of the Singularity University, a Silicon Valley based institution teaching graduates and executives about exponentially growing technologies and their potential to address humanity's grand challenges.
>
> Diamandis has founded or co-founded many of the leading entrepreneurial companies in the exponential technologies sector including Zero Gravity Corporation, Planetary Resources, Inc. and Space Adventures.  He also counsels the world's top enterprises on how to utilize exponential technologies and incentivized innovation to dramatically accelerate their business objectives. Diamandis recently co-Authored Abundance – The Future Is Better Than You Think.

228.    Defendant Loewenbaum, Chairman of the Board, added:

> We are very pleased to have a person of Peter's caliber join our Board of Directors . . . .  Peter brings a unique blend of experience that we expect to enhance the range of skills and expertise within our Board of Directors.

229.    Defendant Reichental stated in describing the unprecedented addition to the Board so closely related to 3D's significant investment in Planetary Resources:

> The addition of Peter Diamandis to our Board underscores our commitment to implement and drive exponential strategies in every part of our business . . . .  We expect Peter's extensive experience, together with his comprehensive understanding of disruptive technologies and crowd sourcing and his incentivized innovation background, will make him a valuable addition to our Board.

230.    Due to the ongoing business relationship between 3D and Planetary Resources, Defendant Diamandis is not independent from the rest of the Board because of business dealings, in which 3D essentially donated $1.5 million to Defendant Diamandis' pet project with no reasonable expectation of repayment, let alone profit.  This significant gratuitous payment by 3D

to and for Defendant Diamandis' benefit, coupled with the extraordinary and unnecessary addition of a directorship and appointment of Defendant Diamandis thereto inuring a financial benefit to Diamandis of over $20,000 per month during the remainder of 2013 and thereafter, left Defendant Diamandis beholden to the Company and the Board.

231.    In light of the above, Defendant Diamandis is inherently intertwined with and between Board decisions by 3D and current and future business transactions with Planetary Resources, rendering him not independent to make such decisions.  Defendant Diamandis, as Co-Founder and Co-Chairman of Planetary Resources, cannot adequately consider a demand on 3D's Board, as Planetary Resources' professional relationship with and future funding from 3D may and likely will be impacted by such decisions and the liability incurred by Defendant Diamandis for the wrongs complained of herein in which he is liable to 3D.

## VI.    DEMAND IS EXCUSED AS TO THE ENTIRE BOARD BECAUSE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR THEIR CONDUCT

232.    The members of the 3D Board of Directors have served as directors of the Company during some or all the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.  This is particularly true since the Company has now had securities fraud claims sustained against it as a result of the Board's misconduct.  As alleged and acknowledged by the Court in the Securities Action, the statements and actions set forth in detail herein regarding, among other things, the material problems with the Company's operations, sales, and inventory that the Individual Defendants caused or allowed to be made repeatedly during the Relevant Period were an integral aspect of the Company's core operations.  It was these very actions and statements that the Individual Defendants caused or allowed the Company to make that subjected 3D to the harm detailed herein.  This was in violation of, among other things, the Individual Defendants' fiduciary duties

of good faith and loyalty.  Indeed, in the Securities Action, the Court specifically noted that the misrepresentations alleged therein, and also presently at issue, were directly related to the Company's core operations.  As such, the Individual Defendants each face a substantial likelihood of liability for their acts in connection with these actions and statements, rendering a demand upon them futile.

233.    Defendants Hull, Curran, Humes, Kever, Loewenbaum, Reichental, Moore, Van Riper, and Welke each signed the false and misleading 2013 Form 10-K.  The 2013 Form 10-K was false and misleading because, among other things, it touted increased revenues based on increased manufacturing and sales, which the Director Defendants either knew, or were reckless in not knowing, were statements that, when made, were materially false and misleading or omitted material facts to make such statements not false and misleading.  As a result, Defendants Hull, Curran, Humes, Kever, Loewenbaum, Reichental, Moore, Van Riper, and Welke face a substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.

## VII.    DEMAND IS EXCUSED BECAUSE THE DIRECTOR FEES RECEIVED BY THE DIRECTOR DEFENDANTS ARE MATERIAL TO THEM AND THEY WOULD NEVER JEOPARDIZE THESE FEES

234.    The director fees received by Defendants Loewenbaum, Curran, Diamandis, Humes, Kever, Welke, Moore, and Van Riper constitute substantial benefits and these benefits are material to these Director Defendants and they would never jeopardize these benefits by voting to sue the Company's officers and directors.

### FIRST CAUSE OF ACTION
#### (Against all Defendants for Breach of Fiduciary Duties)

235.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.     Defendants owed and owe 3D fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe 3D the highest obligation of good faith, loyalty, and due care.

237.     Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to 3D shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

238.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused 3D to engage in the scheme complained of herein, which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to 3D and its shareholders.  As a result, Defendants grossly mismanaged the Company.

239.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, 3D has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

240.     Plaintiff, on behalf of 3D, has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (Against all Defendants for Unjust Enrichment)

241.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

242.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of 3D.

243.     Defendants were unjustly enriched as a result of the compensation they received

while breaching their fiduciary duties owed to 3D.

244.    Plaintiff, as a shareholder and representative of 3D, seeks restitution from Defendants and seeks an Order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from or as a result of their wrongful conduct and fiduciary breaches.

245.    Plaintiff, on behalf of 3D, has no adequate remedy at law.

### THIRD CAUSE OF ACTION
**(Against all Defendants for Abuse of Control)**

246.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

247.    Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of 3D and the investing public by causing the Company to release information that would artificially inflate the price of the Company's stock.    Certain of Defendants then significantly profited on, from, or as a result of the false information regarding the Company's business and prospects.

248.    As such, Defendants have abused their positions of control with the Company and are legally responsible.

249.    Thus, for the aforementioned reasons, Defendants are liable to the Company for their wrongdoing.

### FOURTH CAUSE OF ACTION
**(Against all Defendants for Gross Mismanagement)**

250.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

251.    Defendants owed a duty of oversight to the Company in which they were

responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting, and other disclosures released by the Company.  Furthermore, Defendants were responsible to oversee, manage, and control the operations of the Company, including the manners and methods of reporting in which the acts complained of herein occurred.

252.    Through the wrongful acts complained of herein, Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

253.    By committing the misconduct alleged herein, Defendants breached their fiduciary duties of due care, diligence, and candor in the management and administration of 3D's affairs and in the use and preservation of 3D's assets.

254.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused 3D to engage in the scheme complained of herein, which they knew had an unreasonable risk of damage to 3D, thus breaching their duties to the Company.

255.    As a result, Defendants grossly mismanaged 3D and should be liable to the Company for the resulting damages.

**FIFTH CAUSE OF ACTION**
**(Against Defendants Reichental, Hull, Loewenbaum, Moore, and Gregoire**
**for Breach of Fiduciary Duties for Insider Trading and Misappropriation of Information)**

256.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

257.    Defendants Reichental, Hull, Loewenbaum, Moore, and Gregoire, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public.  These

Defendants participated in the scheme to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

258.    The information that was yet unreleased concerned the Company's ability to increase the capacity of its metal printing business, the demand for its consumer products, the value of multiple companies it was acquiring, and its expected sales and earnings.

259.    This proprietary, non-public information concerning the Company's business and prospects was known by Defendants who sold all or part of their shares throughout the Relevant Period and was done for their own self-interests, at the expense of 3D and the investing public.

260.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, Defendants Reichental, Hull, Loewenbaum, Moore, and Gregoire breached their fiduciary duties of good faith and loyalty to the Company.

261.    As such, Defendants Reichental, Hull, Loewenbaum, Moore, and Gregoire are legally responsible to the Company for the significant profits they received from the sales of their stock in 3D.

### SIXTH CAUSE OF ACTION
**(Against Defendants for Violations of Section 14(a) of the**
**Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder)**

262.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

263.    Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's Proxy statement filed on April 1, 2014 (Form DEF 14A), violated § 14(a) and Rule 14a-9 because it falsely represented that the reason for the Company's growth in sales—which was attributable to its acquisition of other companies rather than any organic growth in sales of particular products—as being due to "growth in demand for 3-D printers" and products.

264.    The April 1, 2014 Proxy further falsely represented that the increase in gross profit—which was attributable to its acquisition of other companies and products with existing gross profits—was due to increased demand for the Company's products.

265.    In the exercise of reasonable care, Defendants knew or should have known that the statements contained in the 2014 Proxy were materially false and misleading.

266.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2014 Proxy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for and respectfully requests that the Court enter judgment as follows:

A.    Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, and unjust enrichment;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 3D and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and committee charters and taking such other actions as

may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

  •  A proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

  •  A proposal to strengthen the Company's internal reporting and financial disclosure controls;

  •  A proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

  •  A proposal to ensure the accuracy of the qualifications of 3D directors, executives, and other employees;

  •  A proposal to require an independent Chairperson of the Board; and

  •  A provision to appropriately test and then strengthen the Company's internal operational control functions;

C.     Awarding to 3D restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.     Awarding to Plaintiff prejudgment interest on all liquidated sums, costs, and disbursements;

F.     Granting such other and further relief as the Court deems just and proper; and

G.     Providing for a jury to determine all triable issues of fact.

[SIGNATURE ON FOLLOWING PAGE]

This 5th day of January, 2017, at Charleston, South Carolina.

/s/Brian C. Duffy
Brian C. Duffy (Fed. ID No. 9491)
Thomas A. Limehouse, Jr. (Fed. ID No. 12148)
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, South Carolina 29401
Telephone: (843) 720-2044
Facsimile: (843) 720-2047
bduffy@duffyandyoung.com
tlimehouse@duffyandyoung.com

and

Edward W. Miller
(*pro hac vice* application forthcoming)
Joshua M. Lifshitz
(*pro hac vice* application forthcoming)
LIFSHITZ & MILLER
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

**Attorneys for Plaintiff**